**Carol SEVERANCE, Petitioner,**

v.

**Jerry PATTERSON, Commissioner of the Texas General Land Office; Greg Abbott, Attorney General for the State of Texas; and Kurt Sistrunk, District Attorney for the County of Galveston, Texas, Respondents.**

No. 09–0387.

Supreme Court of Texas.

Argued Nov. 19, 2009.

Decided Nov. 5, 2010.

Order Abating Grant of Rehearing July 29, 2011.

---

J. David Breemer, Pacific Legal Foundation, Sacramento, CA, Martha Hardwick Hofmeister, Shackelford, Melton & McKinley, L.L.P., Dallas, TX, Carol Severance, pro se, for Carol Severance.

Greg W. Abbott, Attorney General of Texas, Kent C. Sullivan, Jeffrey L. Rose, Attorney General of Texas, Austin, TX, Rafael Edward Cruz, Morgan Lewis Bockius LLP, Houston, TX, Karen Watson Kornell, Office of the Attorney General of Texas, Chief, Natural Res. Div., Daniel L. Geyser, Asst. Solicitor General, Office of the Attorney General of Texas, Ken Cross, Office of the Attorney General, Brian E. Berwick, Office of the Attorney General of Texas, Environmental Protection & Adm. Law Div. (018), Clarence Andrew Weber, First Assistant Attorney General, David S. Morales, Office of the Attorney General of Texas, Deputy First Assistant Attorney General and James C. Ho, Solicitor General of Texas, Austin, TX, for Jerry Patterson.

Barry C. Willey, Galveston County Legal Department, Galveston, TX, for Kurt Sistrunk.

Charles Rice Young, Houston, TX, for Amicus Curiae Surfrider Foundation.

Ted Hirtz, Houston, TX, for Amicus Curiae Surfside Property Owners.

James H. Barrow, Law Offices of James H. Barrow, P.C., San Antonio, TX, for Amicus Curiae Texas Wildlife Association.

Michael V. Powell, Locke Lord Bissell & Liddell LLP, Dallas, TX, for Amicus Curiae Texas Landowners Council.

Lynn E. Blais, University of Texas School of Law, Austin, TX, for Amicus Curiae University of Texas School of Law.

Matthew Joseph Festa, South Texas College of Law, Houston, TX, for Amicus Curiae Matthew J. Festa.

J. Gregory Hudson, Hudson & O'Leary, L.L.P., Austin, TX, for Amicus Curiae Texas Conference of Urban Counties.

Sidney S. McClendon III, Houston, TX, for Amicus Curiae Texas Chapter of the American Shore & Beach Preservation Assoc.

Justice WAINWRIGHT delivered the opinion of the Court, in which Justice HECHT, Justice GREEN, Justice JOHNSON, Justice WILLETT, and Justice GUZMAN joined.

This case comes before us in the form of certified questions from the United States

Court of Appeals for the Fifth Circuit. Pursuant to article V, section 3–c of the Texas Constitution and Texas Rule of Appellate Procedure 58.1, we answer the following questions:

1. Does Texas recognize a "rolling" public beachfront access easement, *i.e.*, an easement in favor of the public that allows access to and use of the beaches on the Gulf of Mexico, the boundary of which easement migrates solely according to naturally caused changes in the location of the vegetation line, without proof of prescription, dedication or customary rights in the property so occupied?

2. If Texas recognizes such an easement, is it derived from common law doctrines or from a construction of the [Open Beaches Act]?

3. To what extent, if any, would a landowner be entitled to receive compensation (other than the amount already offered for removal of the houses) under Texas's law or Constitution for the limitations on use of her property effected by the landward migration of a rolling easement onto property on which no public easement has been found by dedication, prescription, or custom?

*Severance v. Patterson,* 566 F.3d 490, 503–04 (5th Cir.2009), *certified questions accepted,* 52 Tex. Sup.Ct. J. 741 (May 15, 2009).[1] The central issue is whether private beachfront properties on Galveston Island's West Beach are impressed with a right of public use under Texas law without proof of an easement.

Oceanfront beaches change every day. Over time and sometimes rather suddenly, they shrink or grow, and the tide and vegetation lines make corresponding shifts. Beachfront property lines retract or extend as previously dry lands become submerged by the surf or become dry after being submerged. Accordingly, public easements that burden these properties along the sea are also dynamic. They may shrink or expand gradually with the properties they encumber. Once established, we do not require the State to re-establish easements each time boundaries move due to gradual and imperceptible changes to the coastal landscape. However, when a beachfront vegetation line is suddenly and dramatically pushed landward by acts of nature, an existing public easement on the public beach does not "roll" inland to other parts of the parcel or onto a new parcel of land. Instead, when land and the attached easement are swallowed by the Gulf of Mexico in an avulsive event, a new easement must be established by sufficient proof to encumber the newly created dry beach bordering the ocean. These public easements may gradually change size and shape as the respective Gulf-front properties they burden imperceptibly change, but they do not "roll" onto previously unencumbered private beachfront property when avulsive events cause dramatic changes in the coastline.

Legal encumbrances or reservations on private property titles on West Beach in Galveston Island dating from original land grants during the Republic of Texas or at the inception of the State of Texas could provide a basis for a public easement by custom or reveal inherent restrictions on the titles of the privately owned portions of these beaches. Under Mexican law, which governed Texas prior to 1836, colonization of beachfront lands was preclud-

1. We received amicus briefs from the Texas Landowners Council; the Texas Wildlife Foundation; the Surfrider Foundation; the Galveston Chamber of Commerce; Matthew J. Festa, Professor, South Texas College of Law; and Property Owners in Surfside Beach, Texas.

ed for national defense and commercial purposes without approval of the "federal Supreme Executive Power" of Mexico, presumably the Mexican President. However, in 1840 the Republic of Texas, as later confirmed by the State of Texas, granted private title to West Galveston Island without reservation by the State of either title to beachfront property or any public right to use the now privately owned beaches. Public rights to use of privately owned property on West Beach in Galveston Island, if such rights existed at that time, were extinguished in the land patents by the Republic of Texas to private parties. In some states, background principles of property law governing oceanfront property provide a basis for public ownership or use of the beachfront property. Such expansive principles are not extant in the origins of Texas. Indeed, the original transfer by the Republic to private parties forecloses the argument that background principles in Texas common law provide a basis for impressing the West Beach area with a public easement, absent appropriate proof.

The Texas Open Beaches Act (OBA) provides the State with a means of enforcing public rights to use of State-owned beaches along the Gulf of Mexico and of privately owned beach property along the Gulf of Mexico where an easement is established in favor of the public by prescription or dedication, or where a right of public use exists "by virtue of continuous right in the public." TEX. NAT. RES.CODE §§ 61.012, .013(a). When promulgated in 1959, the OBA did not purport to create new substantive rights for public easements along Texas's ocean beaches and

recognized that mere pronouncements of encumbrances on private property rights are improper. Because we find no right of public use in historic grants to private owners on West Beach, the State must comply with principles of law to encumber privately owned realty along the West Beach of Galveston Island.

## I. Background

In April 2005, Carol Severance purchased three properties on Galveston Island's West Beach. "West Beach" extends from the western edge of Galveston's seawall along the beachfront to the western tip of the island. One of the properties, the Kennedy Drive property, is at issue in this case.[2] A rental home occupies the property. The parties do not dispute that no easement has ever been established on the Kennedy Drive property. A public easement for use of a privately owned parcel seaward of Severance's Kennedy Drive property preexisted her purchase. That easement was established in a 1975 judgment in the case of *John L. Hill, Attorney General v. West Beach Encroachment, et al.*, Cause No. 108,156 in the 122nd District Court, Galveston County, Texas. Five months after Severance's purchase, Hurricane Rita devastated the property subject to the easement and moved the line of vegetation landward. The entirety of the house on Severance's property is now seaward of the vegetation line. The State claimed a portion of her property was located on a public beachfront easement and a portion of her house interfered with the public's use of the dry beach. When the State sought to enforce

---

2. Severance owned three properties on West Beach—on Gulf Drive, Kennedy Drive and Bermuda Beach Drive. Her original lawsuit included all three properties, but she only appealed the trial court's judgment dismissing her claims as to two properties. After oral argument to this Court on the certified questions, Severance sold one of two remaining homes at issue in a FEMA-funded buy-out program. Only the Kennedy Drive property remains subject to this litigation.

an easement on her private property pursuant to the OBA, Severance sued several State officials in federal district court. She argued that the State, in attempting to enforce a public easement, without proving its existence, on property not previously encumbered by an easement, infringed her federal constitutional rights and constituted (1) an unreasonable seizure under the Fourth Amendment, (2) an unconstitutional taking under the Fifth and Fourteenth Amendments, and (3) a violation of her substantive due process rights under the Fourteenth Amendment.

The State officials filed motions to dismiss on the merits and for lack of jurisdiction. The district court dismissed Severance's case after determining her arguments regarding the constitutionality of a rolling easement were "arguably ripe," but deficient on the merits. Not presented with the information concerning the Republic's land grant, the court held that, according to Texas property law, an easement on a parcel landward of Severance's property pre-existed her ownership of the property and that after an easement to private beachfront property had been established between the mean high tide and vegetation lines, it "rolls" onto new parcels of realty according to natural changes to those boundaries. *Severance v. Patterson*, 485 F.Supp.2d 793, 802–04 (S.D.Tex.2007). Severance only appealed her Fourth and Fifth Amendment challenges to the rolling easement theory. On appeal, the United States Court of Appeals for the Fifth Circuit determined her Fifth Amendment takings claim was not ripe, but certified unsettled questions of state law to this Court to guide its determination on her Fourth Amendment unreasonable seizure claim. *Severance*, 566 F.3d at 500.

## A. Texas Property Law in Coastal Areas

■ We have not been asked to determine whether a taking would occur if the State ordered removal of Severance's house, although constitutional protections of property rights fortify the conclusions we reach. The certified questions require us to address the competing interests between the State's asserted right to a migratory public easement to use privately owned beachfront property on Galveston Island's West Beach and the rights of the private property owner to exclude others from her property. The "law of real property is, under [the federal] Constitution, left to the individual states to develop and administer." *Phillips Petrol. Co. v. Mississippi*, 484 U.S. 469, 484, 108 S.Ct. 791, 98 L.Ed.2d 877 (1988) (quoting *Hughes v. Washington*, 389 U.S. 290, 295, 88 S.Ct. 438, 19 L.Ed.2d 530 (1967) (Stewart, J., concurring)); *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, —— U.S. ——, 130 S.Ct. 2592, 2612, 177 L.Ed.2d 184 (2010) ("The Takings Clause only protects property rights as they are established under state law, not as they might have been established or ought to have been established."); *Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 377, 97 S.Ct. 582, 50 L.Ed.2d 550 (1977) (explaining that "subsequent changes in the contour of the land, as well as subsequent transfers of the land, are governed by the state law" (citation omitted)).

Texas has a history of public use of Texas beaches, including on Galveston Island's West Beach. *See, e.g., Matcha v. Mattox*, 711 S.W.2d 95, 99 (Tex.App.-Austin 1986, writ ref'd n.r.e.) (holding that "[n]o one doubts that proof exists from which the district court could conclude that the public acquired an easement over Galveston's West Beach by custom"), *cert.*

*denied,* 481 U.S. 1024, 107 S.Ct. 1911, 95 L.Ed.2d 517 (1987); *Feinman v. State,* 717 S.W.2d 106, 113 (Tex.App.-Houston [1st Dist.] 1986, writ ref'd n.r.e.) (discussing evidence presented at the trial court that showed "public use of West Beach since before Texas gained its independence from Mexico"). These rights of use were proven in courtrooms with evidence of public enjoyment of the beaches dating to the nineteenth century Republic of Texas. But that history does not extend to use of West Beach properties, recently moved landward of the vegetation line by a dramatic event, that before and after the event have been owned by private property owners and were not impressed with pre-existing public easements. On one hand, the public has an important interest in the enjoyment of Texas's public beaches. But on the other hand, the right to exclude others from privately owned realty is among the most valuable and fundamental of rights possessed by private property owners.

### 1. Defining Public Beaches in Texas

The Open Beaches Act states the policy of the State of Texas for enjoyment of public beaches along the Gulf of Mexico.

The OBA declares the State's public policy to be "free and unrestricted right of ingress and egress" to State-owned beaches and to private beach property to which the public "has acquired" an easement or other right of use to that property. TEX. NAT. RES.CODE § 61.011(a). It defines public beaches as:

> any beach area, whether publicly or privately owned, extending inland from the line of mean low tide to the line of vegetation bordering on the Gulf of Mexico to which the public has acquired the right of use or easement to or over the area by prescription, dedication, presumption, or has retained a right by virtue of continuous right in the public since time immemorial, as recognized in law and custom. This definition does not include a beach that is not accessible by a public road or public ferry as provided in Section 61.021 of this code.

*Id.* § 61.001(8).[3] Privately owned beaches may be included in the definition of public beaches. *Id.* The Legislature defined public beach by two criteria: physical location and right of use. A public beach under the OBA must border on the Gulf of Mexico. *Id.* The OBA does not specifical-

---

3. In 2009, Texas voters approved an amendment to the Constitution to protect the public's right to "state-owned beach[es]" of the Gulf of Mexico. TEX. CONST. art. I, § 33. It protects public use of public beaches which, like the OBA, are defined as State-owned beaches and privately owned beachland "to which the public has acquired a right of use or easement...." Although not at issue in this case, the amendment provides:

> Section 1. Article I, Texas Constitution, is amended by adding Section 33 to read as follows:
> Sec. 33. (a) In this section, "public beach" means a state-owned beach bordering on the seaward shore of the Gulf of Mexico, extending from mean low tide to the landward boundary of state-owned submerged land, and any larger area extending from the line of mean low tide to the line of

vegetation bordering on the Gulf of Mexico to which the public has acquired a right of use or easement to or over the area by prescription or dedication or has established and retained a right by virtue of continuous right in the public under Texas common law.
> (b) The public, individually and collectively, has an unrestricted right to use and a right of ingress to and egress from a public beach. The right granted by this subsection is dedicated as a permanent easement in favor of the public.
> (c) The legislature may enact laws to protect the right of the public to access and use a public beach and to protect the public beach easement from interference and encroachments.
> (d) This section does not create a private right of enforcement.

ly refer to inland bodies of water. Along the Gulf, public beaches are located on the ocean shore from the line of mean low tide to the line of vegetation, subject to the second statutory requirement explained below. *Id.* The area from mean low tide to mean high tide is called the "wet beach," because it is under the tidal waters some time during each day. The area from mean high tide to the vegetation line is known as the "dry beach."

The second requirement for a Gulf-shore beach to fall within the definition of "public beach" is the public must have a right to use the beach. This right may be "acquired" through a "right of use or easement" or it may be "retained" in the public by virtue of continuous "right in the public since time immemorial." *Id.*

The wet beaches are all owned by the State of Texas,[4] which leaves no dispute over the public's right of use. *See Luttes v. State*, 159 Tex. 500, 324 S.W.2d 167, 169, 191–92 (1958); Tex. Nat. Res.Code §§ 61.011, .161 (recognizing the public policies of the public's right to use public beaches and the public's right to ingress and egress to the sea). However, the dry beach often is privately owned and the right to use it is not presumed under the OBA.[5] The Legislature recognized that the existence of a public right to an easement in privately owned dry beach area of West Beach is dependant on the government's establishing an easement in the dry

beach or the public's right to use of the beach "by virtue of continuous right in the public since time immemorial...." Tex. Nat Res.Code § 61.001(8). Accordingly, where the dry beach is privately owned, it is part of the "public beach" if a right to public use has been established on it. *See id.* Thus, a "public beach" includes but is broader than beaches owned by the State in those instances in which an easement for public use is established in the dry beach area. *Id.* Public beaches include Gulf-front wet beaches, State-owned dry beaches and private property in the dry beaches on which a public easement has been established.

In this case, before Hurricane Rita, Severance's Kennedy Drive property was landward of the vegetation line. After Hurricane Rita, because the storm moved the vegetation line landward, the property between Severance's land and the sea that was subject to a public easement was submerged in the surf or became part of the wet beach. Severance's Kennedy Drive parcel and her house are no longer behind the vegetation line but neither are they located in the wet beach owned by the State. At least a portion of Severance's Kennedy Drive property and all of her house are now located in the dry beach. The question is did the easement on the property seaward of Severance's property "roll" onto Severance's property? In other words, is Severance's house now located

---

4. State-owned beaches are the strips of coastal property "between mean low tide and mean high tide, which runs along the entire Gulf Coast, regardless of whether the property immediately landward is privately or state owned." Richard J. Elliott, *The Texas Open Beaches Act: Public Rights to Beach Access*, 28 Baylor L.Rev. 383, 384 (1976).

5. The OBA includes two stated presumptions for purposes of ingress and egress to the sea. It provides that the title of private owners of dry beach area in Gulf beaches "does not

include the right to prevent the public from using the area for ingress and egress to the sea." Tex. Nat. Res.Code § 61.020(a)(1). In 1991, the OBA was amended to add a second presumption that imposed "on the area a common law right or easement in favor of the public for ingress and egress to the sea." *Id.* § 61.020(a)(2). Although the constitutionality of these presumptions has been questioned, that issue is not before us. *See Seaway Co. v. Att'y Gen.*, 375 S.W.2d 923, 929–30 (Tex.Civ. App.-Houston 1964, writ ref'd n.r.e.).

on part of the "public beach" and thereby subject to an enforcement action to remove it under the OBA? From the Fifth Circuit's statement of the case, we understand that no easement has been proven to exist on Severance's property under the OBA or the common law.[6] We also presume that there are no express limitations or reservations in Severance's title giving rise to a public easement. The answer to the rolling easement question thus turns on whether Texas common law recognizes such an inherent limitation on private property rights along Galveston's West Beach, and if not, whether principles of Texas property law provide for a right of public use of beaches along the Gulf Coast.

### 2. History of Beach Ownership Along the Gulf of Mexico

■■■■ Long-standing principles of Texas property law establish parameters for our analysis. It is well-established that the "soil covered by the bays, inlets, and arms of the Gulf of Mexico within tidewater limits belongs to the State, and constitutes public property that is held in trust for the use and benefit of all the people." *Lorino v. Crawford Packing Co.*, 142 Tex. 51, 175 S.W.2d 410, 413 (1943); *Landry v. Robison*, 110 Tex. 295, 219 S.W. 819, 820 (1920) ("For our decisions are unanimous in the declaration that by the principles of the civil and common law, soil under navigable waters was treated as held by the state or nation in trust for the whole people." [7]); *De Meritt v. Robison Land Comm'r*, 102 Tex. 358, 116 S.W. 796, 797 (1909) (holding "[i]n the contemplation of

law," soil lying below the line of ordinary high tide, "was not land, but water"); *see also* TEX. NAT. RES.CODE § 11.012(c) ("The State of Texas owns the water and the beds and shores of the Gulf of Mexico and the arms of the Gulf of Mexico within the boundaries provided in this section, including all land which is covered by the Gulf of Mexico and the arms of the Gulf of Mexico either at low tide or high tide."). These lands are part of the public trust, and only the Legislature can grant to private parties title to submerged lands that are part of the public trust. *Lorino*, 175 S.W.2d at 414; *see also TH Invs., Inc. v. Kirby Inland Marine, L.P.*, 218 S.W.3d 173, 182–83 (Tex.App.-Houston [14th Dist.] 2007, pet. denied) (holding that lands submerged in the Gulf belong to the State) (citations omitted), *cert. denied,* —— U.S. ——, 129 S.Ct. 899, 173 L.Ed.2d 107 (2009).

Current title to realty and corresponding encumbrances on the property may be affected in important ways by the breadth of and limitations on prior grants and titles. We review the original Mexican and Republic of Texas grants and patents to lands abutting the sea in West Galveston Island.[8] The Republic of Texas won her independence from Mexico in 1836. Mexico's laws prohibited colonization of land within ten leagues of the coast without approval from the president. General Law of Colonization, art. 4 (Mex., Aug. 18, 1824), *reprinted in* 1 H.P.N. GAMMEL, THE LAWS OF TEXAS 1822–1897 [hereinafter "GAMMEL, THE LAWS OF TEXAS"], at 97, 97 (Austin, Gammel Book Co. 1898).[9] Title to

---

6. That issue is not before us, but it may be addressed in the federal courts.

7. "The bays, inlets, and other waters along the Gulf Coast which are subject to the ebb and flow of the tide of the Gulf of Mexico are defined as 'navigable waters.' " *Lorino*, 175 S.W.2d at 413 (citing *City of Galveston v. Mann*, 135 Tex. 319, 143 S.W.2d 1028 (1940);

*Crary v. Port Arthur Channel & Dock Co.*, 92 Tex. 275, 47 S.W. 967 (1898)).

8. The briefs and the record do not address the early land grant of Galveston's West Beach.

9. The Mexican federal government "feared that an influx of foreigners along the border of the United States, or along the coast, might

West Beach property was first granted in November 1840 by the Republic of Texas to Levi Jones and Edward Hall in a single patent (the "Jones and Hall Grant"). *See Seaway Co. v. Att'y Gen.*, 375 S.W.2d 923, 928 (Tex.Civ.App.-Houston 1964, writ ref'd n.r.e.).[10] After admission to the Union in 1845, the State of Texas by legislation in 1852 and 1854 first confirmed the validity of the Jones and Hall Grant and then disclaimed title to those lands. In 1852, the State declared that it "hereby releases and relinquishes forever, all of her title to such lots on Galveston Island as are now in the actual possession and occupation of persons who purchased under the [Jones and Hall Grant]." Act approved Feb. 16, 1852, 4th Leg., R.S., ch. 119, § 1, 1852 Tex. Gen. Laws 142, 142, *reprinted in* 3 GAMMEL, THE LAWS OF TEXAS, at 1020, 1020; Act

of Feb. 8, 1854, 5th Leg., R. S., ch. 73, § 1, 1854 Tex. Special Laws 125, 125–26, *reprinted in* 4 GAMMEL, THE LAWS OF TEXAS, at 125, 125–26 (confirming the 1840 Jones and Hall Grant and "disclaim[ing] any title in and to the lands described in said patent, in favor of the grantees and those claiming under them").[11] In 1854, the State affirmed its intent to grant ownership of all land in West Beach up to the public trust to Jones and Hall with no express reservation of either title to the property or a public right to use the beaches.[12] The government relinquished all title in the Jones and Hall Grant, without reserving any right to use of the property. The Republic could have reserved the right of the public to use the beachfront property, "but the plain language of the grant shows the Republic of Texas did

become too powerful, and betray the country to a foreign power." LEWIS N. DEMBITZ, A TREATISE ON LAND TITLES IN THE UNITED STATES § 73, at 558 (1895).

10. *See also* Jones and Hall Grant Papers, *available at* http://wwwdb.glo.state.tx.us/central/LandGrants/LandGrantsSearch.cfm (search abstract number 121, Galveston County).

11. The act reads: "Be it enacted by the Legislature of the State of Texas, That the patent issued by the Commissioner of the General Land[ O]ffice, on the twenty-eighth day of November, eighteen hundred and forty, to Levi Jones and Edward Hall, for lands on Galveston Island, be, and the same is hereby confirmed, and the State of Texas disclaims any title in and to the lands described in said patent, in favor of the grantees and those claiming under them." Act of Feb. 8, 1854, 5th Leg., R.S., ch. 73, § 1, 1854 Tex. Special Laws 125, 125–26, *reprinted in* 4 GAMMEL. THE LAWS OF TEXAS. at 125, 125–26.

12. There is some historical evidence that the Republic made an abortive attempt to parcel and sell title to lands on West Galveston Island starting in 1837. *See* Act approved June 12, 1837, 1st Cong., 1 Repub. Tex. Laws 267, 267 (1838), *reprinted in* 1 GAMMEL, THE LAWS OF TEXAS, at 1327, 1327 (authorizing sales of title

to lots on Galveston Island by auction); Annual Report of the Secretary of the Treasury, Nov. 1839, *reprinted in* 3 HARRIET SMITHER, JOURNALS OF THE FOURTH CONGRESS OF THE REPUBLIC OF TEXAS 1839–1840, at 35, 45 (Austin, Texas State Library 1931) (reporting treasury receipts "on account Sales Galveston Island"). In an 1860 mandamus proceeding, in light of then-lingering questions about the validity of Jones and Hall's title to West Beach, a district court directed the land commissioner to issue a single land patent to Jones and Hall for all of West Beach. *See Franklin v. Kesler*, 25 Tex. 138, 142–43(1860) (describing the patent issued pursuant to mandamus). The February 15, 1852 act expressly vested title in those claiming successor title under the Jones and Hall Grant, and the February 8, 1854 act confirms the Jones and Hall Grant in its entirety. Further, *Wilcox v. Chambers* confirmed that if title of coastal lands were granted to foreigners (non-Mexican individuals) prior to 1840, the grants are presumed void absent specific approval by the Mexican President. 26 Tex. 180, 187 (1862).

Legislation and a patent (the "Menard Grant") conveyed oceanfront property on the east side of Galveston Island to private parties in 1836 and 1838. *Mayor, Aldermen & Inhabitants of the City of Galveston v. Menard*, 23 Tex. 349, 391 (1859).

not do so." *Seaway Co.*, 375 S.W.2d at 929. All the Gulf beachland in West Galveston Island that extended to the public trust was conveyed to private parties by the sovereign Republic of Texas as later affirmed by the State of Texas.

Having established that the State of Texas owned the land under Gulf tidal waters, the question remained how far inland from the low tide line did the public trust—the State's title—extend. We answered that question in *Luttes v. State*. This Court held that the delineation between State-owned submerged tidal lands (held in trust for the public) and coastal property that could be privately owned was the "mean higher high tide" line under Spanish or Mexican grants and the "mean high tide" line under Anglo–American law.[13] 159 Tex. 500, 324 S.W.2d 167, 191–92 (1958). The wet beach is owned by the State as part of the public trust, and the dry beach is not part of the public trust and may be privately owned. *See generally id.* Prior to *Luttes*, there was a question whether the public trust extended to the vegetation line. *Luttes* established the landward boundary of the public trust at the mean high tide line. *Luttes*, 324 S.W.2d at 187–88.

These boundary demarcations are a direct response to the ever-changing nature of the coastal landscape because it is impractical to apply static real property boundary concepts to property lines that are delineated by the ocean's edge. The sand does not stay in one place, nor does the tide line. While the vegetation line may appear static because it does not move daily like the tide, it is constantly affected by the tide, wind, and other weather and natural occurrences.

A person purchasing beachfront property along the Texas coast does so with the risk that their property may eventually, or suddenly, recede into the ocean. When beachfront property recedes seaward and becomes part of the wet beach or submerged under the ocean, a private property owner loses that property to the public trust. We explained in *State v. Balli:*

> Any distinction that can be drawn between the alluvion of rivers and accretions cast up by the sea must arise out of the law of the seashore rather than that of accession and be based . . . upon the ancient maxim that the seashore is common property and never passes to private hands. . . . [This] remains as a guiding principle in all or nearly all jurisdictions which acknowledge the common law. . . .

144 Tex. 195, 190 S.W.2d 71, 100 (1945). Likewise, if the ocean gradually recedes away from the land moving the high tide line seaward, a private property owner's land may increase at the expense of the public trust. *See id.* Regardless of these changes, the boundary remains fixed (rela-

---

**13.** Severance's parcel is not subject to Spanish or Mexican law. So, we refer to the mean high tide line throughout this opinion. On January 20, 1840, Texas adopted the common law of England as its rule of decision, to the extent it was not inconsistent with the Constitution of the Republic of Texas or acts of its Congress. Act approved Jan. 20, 1840, 4th Cong., R.S., § 1, 1840 Repub. Tex. Laws 3, 3–4, *reprinted in* 2 GAMMEL, THE LAWS OF TEXAS, at 177, 177–80; *Miller v. Letzerich*, 121 Tex. 248, 49 S.W.2d 404, 408 (1932) (explaining that "the validity and legal effect of contracts and of grants of land made before the adoption of the common law must be determined according to the civil law in effect at the time of the grants"). Because the Jones and Hall Grant was made in November 1840, land granted under that patent is governed by the common law. *See* William Gardner Winters, Jr., *The Shoreline for Spanish and Mexican Grants in Texas*, 38 TEX. L.REV. 523 (1960) (discussing the history of Spanish and Mexican land patents and common law basis for shoreline boundaries).

tively) at the mean high tide line. *See Luttes*, 324 S.W.2d at 191–93. Any other approach would leave locating that boundary to pure guesswork. *See Coastal Indus. Water Auth. v. York*, 532 S.W.2d 949, 952 n. 1 (Tex.1976).

In 1959, the Legislature enacted the Open Beaches Act to address responses to the *Luttes* opinion establishing the common law landward boundary of State-owned beaches at the mean high tide line. The Legislature feared that this holding might "give encouragement to some over-anxious developers to fence the seashore" as some private landowners had "erected barricades upon many beaches, some of these barricades extending into the water." Tex. Legis. Beach Study Comm., 57th Leg., R.S., The Beaches and Islands of Texas [hereinafter "Beach Study Comm., Beaches and Islands of Texas"] 1 (1961), *available at* http://www.lrl.state.tx.us/scanned/interim/56/56_B352.pdf; Tex. Leg. Interim Beach Study Comm., 65th Leg., R.S., Footprints on the Sands of Time [hereinafter "Beach Study Comm., Footprints"] 22 (1969), *available at* http://www.lrl.state.tx.us/scanned/interim/60/B352.pdf. The OBA declared the State's public policy for the public to have "free and unrestricted access" to State-owned beaches, the wet beach, and the dry beach where the public "has acquired" an easement or other right to use that property. Tex. Nat. Res.Code § 61.011(a). To enforce this policy, the OBA prohibits anyone from creating, erecting, or constructing any "obstruction, barrier, or restraint that will interfere with the free and unrestricted right of the public" to access Texas beaches where the public has acquired a right of use or easement. *Id.* § 61.013(a). The Act authorizes the removal of barriers or other obstructions on

> state-owned beaches to which the public has the right of ingress and egress bordering on the seaward shore of the Gulf

of Mexico or any larger area extending from the line of mean low tide to the line of vegetation bordering on the Gulf of Mexico *if the public has acquired* a right of use or easement to or over the area by prescription, dedication, or has *retained a right by virtue of continuous right in the public.*

*Id.* §§ 61.012, .013(a) (emphasis added).

The OBA does not alter *Luttes*. It enforces the public's right to use the dry beach on private property where an easement exists and enforces public rights to access and use State-owned beaches. Therefore, the OBA, by its terms, does not create or diminish substantive property rights. Beach Study Comm., Footprints 22 (stating that the "statute cannot truly be said to create any new rights"); Richard J. Elliott, *Open Beaches Act: Public Rights to Beach Access*, 28 Baylor L.Rev. 383, 392 (1976) ("In terms of pure substantive law, the Open Beaches Act probably creates no rights in the public which did not previously exist under the common law."). In promulgating the OBA, the Legislature seemed careful to preserve private property rights by emphasizing that the enforcement of public use of private beachfront property can occur when a historic right of use is retained in the public or is proven by dedication or prescription. *See* Tex. Nat. Res.Code § 61.013(a), (c). The OBA also specifically disclaims any intent to take rights from private owners to Gulf-shore beach property. *Id.* § 61.023; *see Seaway Co.*, 375 S.W.2d at 930 ("There is nothing in the Act which seeks to take rights from an owner of land."). Within these acknowledgments, the OBA proclaims that beaches should be open to the public. Certainly, the OBA guards the right of the public to use public beaches against infringement by private interests. But, as explained, the OBA is not contrary to private property rights at issue in this case under principles of Texas law. The

public has a right to use the West Galveston beaches when the State owns the beaches or the government obtains or proves an easement for use of the dry beach under the common law or by other means set forth in the OBA.[14]

In 1969, the Legislature's Interim Beach Study Committee, chaired by Senator A.R. Schwartz of Galveston County, confirmed the view that:

> [The OBA] does not, and can not, declare that the public has an easement on the beach, a right of access over private property to and from the State-owned beaches bordering on the Gulf of Mexico. *An easement is a property interest; the State can no more impress private property with an easement without compensating the owner of the property than it can build a highway across such land without paying the owner.*

BEACH STUDY COMM., FOOTPRINTS 17. The Interim Beach Study Committee was created, among other reasons, to assure that beach development be undertaken to serve the best interests of the people of Texas and to study methods of procuring right-of-ways for roads parallel to the beaches, easements for ingress and egress to the beach, parking for beach access, methods for negotiating with landowners for additional easements, and rights for landowners to construct works for the protection of their property. *Id.* at 1–2.

### B. Background on Severance's Property

Carol Severance purchased the Kennedy Drive property on Galveston Island's West Beach in 2005. The Fifth Circuit explained that "[n]o easement has ever been established on [her] parcel via prescription, implied dedication, or continuous right." 566 F.3d at 494. The State obtained the *Hill* judgment in 1975 that encumbered a strip of beach seaward of Severance's property. Severance's Kennedy Drive parcel was not included in the 1975 judgment. However, the parties dispute whether or not Severance's parcel was ever subject to a public easement.

In 1999, the Kennedy Drive house was on a Texas General Land Office (GLO) list of approximately 107 Texas homes located seaward of the vegetation line after Tropical Storm Frances hit the island in 1998. In 2004, the GLO again determined that the Kennedy Drive home was located "wholly or in part" on the dry beach in 2004, but did not threaten public health or safety and, at the time, was subject to a GLO two-year moratorium order. When Severance purchased the property, she received an OBA-mandated disclosure explaining that the property may become located on a public beach due to natural processes such as shoreline erosion, and if that happened, the State could sue seeking to forcibly remove any structures that come to be located on the public beach. *See* TEX. NAT. RES.CODE § 61.025. Winds attributed to Hurricane Rita shifted the vegetation line further inland in September 2005. In 2006, the GLO determined that Severance's house was entirely within the public beach.

---

14. In 1961, The Texas Legislative Beach Study Committee further evidenced its recognition that private property rights exist in the dry beaches by proposing to the 57th Legislature that it come up with practical methods for not only procuring easements for ingress and egress to beaches but also methods of "negotiations with landowners for additional easements" for the "use and pleasure of the public, provided such lands or easements can be obtained without cost to the State." BEACH STUDY COMM., BEACHES AND ISLANDS OF TEXAS xi. If Gulf-front dry beach property were State-owned or already impressed with an easement for public use (as compared to ingress and egress), negotiations to obtain them would not be necessary.

The moratorium for enforcing the OBA on Severance's properties expired on June 7, 2006. Severance received a letter from the GLO requiring her to remove the Kennedy Drive home because it was located on a public beach. A second letter reiterated that the home was in violation of the OBA and must be removed from the beach, and offered her $40,000 to remove or relocate it if she acted before October 2006. She initiated suit in federal court. The Fifth Circuit certified questions of Texas law to this Court.

## II. Dynamic Public Beachfront Easements

The first certified question asks if Texas recognizes "a 'rolling' public beachfront access easement, i.e., an easement in favor of the public that allows access to and use of the beaches on the Gulf of Mexico, the boundary of which easement migrates solely according to naturally caused changes in the location of the vegetation line, without proof of prescription, dedication, or customary rights in the property so occupied?" 566 F.3d at 504. We have never held that the State has a right in privately owned beachfront property for public use that exists without proof of the normal means of creating an easement. And there is no support presented for the proposition that, during the time of the Republic of Texas or at the inception of our State, the State reserved the oceanfront for public use. In fact, as discussed above, the Texas Legislature expressly disclaimed any interest in title obtained from the Jones and Hall Grant after our State was admitted to the Union. See Section I.A.2, supra; see also Seaway Co., 375 S.W.2d at 928 ("On November 28, 1840, the Republic of Texas issued its patent to Levi Jones and Edward Hall to 18,215 acres of land on Galveston Island. This grant covered all of Galveston Island except the land covered by the Menard Grant covering the east portion of the Island."). Therefore, considering the absence of any historic custom or inherent title limitations for public use on private West Beach property, principles of property law answer the first certified question.

Easements exist for the benefit of the easement holder for a specific purpose. An easement does not divest a property owner of title, but allows another to use the property for that purpose. See Marcus Cable Assocs., L.P. v. Krohn, 90 S.W.3d 697, 700 (Tex.2002) (explaining that an easement relinquishes a property owner's right to exclude someone from their property for a particular purpose) (citations omitted). The existence of an easement "in general terms implies a grant of unlimited reasonable use such as is reasonably necessary and convenient and as little burdensome as possible to the servient owner." Coleman v. Forister, 514 S.W.2d 899, 903 (Tex.1974). An easement appurtenant "defines the relationship of two pieces of land"—a dominant and a servient estate. See 7 THOMPSON ON REAL PROPERTY § 60.02(f)(1), at 469 (David A. Thomas, ed.2006). Because the easement holder is the dominant estate owner and the land burdened by the easement is the servient estate, the property owner may not interfere with the easement holder's right to use the servient estate for the purposes of the easement. Drye v. Eagle Rock Ranch, Inc., 364 S.W.2d 196, 207 (Tex.1963) (citation omitted); Vrazel v. Skrabanek, 725 S.W.2d 709, 711 (Tex.1987).

Easement boundaries are generally static and attached to a specific portion of private property. See Holmstrom v. Lee, 26 S.W.3d 526, 533 (Tex.App.-Austin 2000, no pet.) ("Once established, the location or character of the easement cannot be changed without the consent of the parties."); see also 7 THOMPSON ON REAL PROP-

ERTY § 60.04(c)(1)(ii), at 538–40. "As a general rule, once the location of an easement has been established, neither the servient estate owner nor the easement holder may unilaterally relocate the servitude." JON W. BRUCE & JAMES W. ELY, JR., THE LAW OF EASEMENTS AND LICENSES IN LAND § 7:13, at 7–30 (2009). Therefore, a new easement must be re-established for it to encumber a part of the parcel not previously encumbered. *See id.*

While the boundaries of easements on the beach are necessarily dynamic due to the composition of the beach and its constantly changing boundaries, easements for public use of privately owned dry beach do not necessarily burden the area between the mean high tide and vegetation lines when the land originally burdened by the easement becomes submerged by the ocean. They do not automatically move to the new properties; they must be proven.

Like easements, real property boundaries are generally static as well. But property boundaries established by bodies of water are necessarily dynamic. Because those boundaries are dynamic due to natural forces that affect the shoreline or banks, the legal rules developed for static boundaries are somewhat different. *See York,* 532 S.W.2d at 952 (discussing erosion, accretion, and avulsion doctrines affecting property boundaries and riparian ownership in the Houston Ship Channel).

The nature of littoral property boundaries abutting the ocean not only incorporates the daily ebbs and flows of the tide, but also more permanent changes to the coastal landscape due to weather and other natural forces.[15] Shoreline property ownership is typically delineated by boundaries such as the mean high tide and vegetation lines because they are easy to reference and locate. Sand and water are constantly moving and changing the landscape whether it is gradual and imperceptible or sudden and perceptible.

■ Courts generally adhere to the principle that littoral property owners gain or lose land that is gradually or imperceptibly added to or taken away from their banks or shores through erosion, the wearing away of land, and accretion, the enlargement of the land. *Id.* at 952. Avulsion, as derived from English common law, is the sudden and perceptible change in land and is said not to divest an owner of title. *Id.* We have never applied the avulsion doctrine to upset the mean high tide line boundary as established by *Luttes.*[16] 324 S.W.2d at 191.

Property along the Gulf of Mexico is subjected to seasonal hurricanes and tropical storms, on top of the every-day natural forces of wind, rain, and tidal ebbs and flows that affect coastal properties and shift sand and the vegetation line. This is an ordinary hazard of owning littoral prop-

15. "Riparian" means "[o]f, relating to, or located on the bank of a river or stream (or occasionally another body of water, such as a lake)." BLACK'S LAW DICTIONARY 1352 (8th ed.2004). "Littoral" means "[o]f or relating to the coast or shore of an ocean, sea, or lake." BLACK'S LAW DICTIONARY 952 (8th ed.2004).

16. Some states apply avulsion to determine that the mean high tide line as it existed before the avulsive event remains the boundary between public and private ownership of beach property after the avulsive event;

therefore, allowing private property owners to retain ownership of property that becomes submerged under the ocean. *See Walton Cnty. v. Stop the Beach Renourishment,* 998 So.2d 1102, 1116–17 (Fla.2008), *aff'd sub nom. Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.,* —— U.S. ——, 130 S.Ct. 2592, 177 L.Ed.2d 184 (2010); *Cinque Bambini P'ship v. State,* 491 So.2d 508, 520 (Miss.1986). We have not accepted such an expansive view of the doctrine, but, we need not make that determination in this case.

erty. And, while losing property to the public trust as it becomes part of the wet beach or submerged under the ocean is an ordinary hazard of ownership for coastal property owners, it is far less reasonable to hold that a public easement can suddenly encumber an entirely new portion of a landowner's property that was not previously subject to that right of use. *See, e.g., Phillips Petrol.,* 484 U.S. at 482, 108 S.Ct. 791 (discussing the importance of "honoring reasonable expectations in property interests[,]" but ultimately holding the property owner's expectations in that situation were unreasonable). Gradual movement of the vegetation line and mean high tide line due to erosion or accretion have very different practical implications.

 Like littoral property boundaries along the Gulf Coast, the boundaries of corresponding public easements are also dynamic. The easements' boundaries may move according to gradual and imperceptible changes in the mean high tide and vegetation lines. However, if an avulsive event moves the mean high tide line and vegetation line suddenly and perceptibly causing the former dry beach to become part of State-owned wet beach or completely submerged, the private property owner is not automatically deprived of her right to exclude the public from the new dry beach. In those situations, when changes occur suddenly and perceptibly to materially alter littoral boundaries, the land encumbered by the easement is lost to the public trust, along with the easement attached to that land. Then, the State may seek to establish another easement as permitted by law on the newly created dry beach to enforce an asserted public right to use private land.

It would be an unnecessary waste of public resources to require the State to obtain a new judgment for each gradual and nearly imperceptible movement of

coastal boundaries exposing a new portion of dry beach. These easements are established in terms of boundaries such as the mean high tide line and vegetation line; presumably public use moves according to and with those boundaries so the change in public use would likewise be imperceptible. Also, when movement is gradual, landowners and the State have ample time to reach a solution as the easement slowly migrates landward with the vegetation line. Conversely, when drastic changes expose new dry beach and the former dry beach that may have been encumbered by a public easement is now part of the wet beach or completely submerged under water, the State must prove a new easement on the area. Because sudden and ˙ perceptible changes by nature occur very quickly, it would be impossible to prove continued public use in the new dry beach, and it would be unfair to impose such drastic restrictions through the OBA upon an owner in those circumstances without compensation. *See Westgate, Ltd. v. State,* 843 S.W.2d 448, 452 (Tex.1992) (explaining the circumstances from which an action for inverse condemnation may arise).

If the public has an easement in newly created dry beach, as with any other property, the State must prove it. Having divested title to all such West Beach property in the early years of the Republic, the State of Texas can only acquire or burden private property according to the law. Thus, a public beachfront easement in West Beach, although dynamic, does not roll. The public loses that interest in privately owned dry beach when the land to which it is attached becomes submerged underwater. While these boundaries are somewhat dynamic to accommodate the beach's everyday movement and imperceptible erosion and accretion, the State cannot declare a public right so expansive as to always adhere to the dry beach even

when the land the easement originally attached to is eroded. This could divest private owners of significant rights without compensation because the right to exclude is one of the most valuable and fundamental rights possessed by property owners. *See Town of Flower Mound v. Stafford Estates Ltd. P'ship,* 135 S.W.3d 620, 634 (Tex.2004) (referring to the right to exclude as " 'one of the most essential sticks in the bundle of rights that are commonly characterized as property' ") (quoting *Dolan v. City of Tigard,* 512 U.S. 374, 393, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994)). We have never held the dry beach to be encompassed in the public trust. *See Luttes,* 324 S.W.2d at 191–92.

On this issue of first impression, we hold that Texas does not recognize a "rolling" easement on Galveston's West Beach. Easements for public use of private dry beach property do change along with gradual and imperceptible changes to the coastal landscape. But, avulsive events such as storms and hurricanes that drastically alter pre-existing littoral boundaries do not have the effect of allowing a public use easement to migrate onto previously unencumbered property. This holding shall not be applied to use the avulsion doctrine to upset the long-standing boundary between public and private ownership at the mean high tide line. That result would be unworkable, leaving ownership boundaries to mere guesswork. The division between public and private ownership remains at the mean high tide line in the wake of naturally occurring changes, even when boundaries seem to change suddenly.[17] The State, as always, may act within a valid exercise of police power to impose reasonable regulations on coastal property or prove the existence of an easement for

public use, consistent with the Texas Constitution and real property law.

The dissent would reach a different result by arguing the public has the right to use the dry beach regardless of the boundaries of private property or the constitutional protections accorded those rights. That approach would raise constitutional concerns. "To say that the appropriation of a public easement across a landowner's premises does not constitute the taking of a property interest but rather . . . 'a mere restriction on its use,' . . . is to use words in a manner that deprives them of all their ordinary meaning." *Nollan v. Cal. Coastal Comm'n,* 483 U.S. 825, 831, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987) (citation omitted); *see* Elliott, 28 Baylor L.Rev. at 385–86 ("Since a simple legislative declaration of policy [such as declaring a right to an easement across private property], cannot provide the requisite due process, the affirmative policy statement of the Open Beaches Act, without more would appear patently unconstitutional. The legislature has apparently sought to avoid such constitutional problems by qualifying affirmatively-declared public rights with an interesting condition precedent. That condition is that the public must have *already acquired* these identical rights under the common law doctrines of prescription or dedication.").

According to the dissent, an easement could remain in the dry beach even if the land encumbered by the original easement becomes submerged by the ocean and the dry beach is composed of new land that was not previously encumbered by an easement. Its argument is likewise based on the premise that an alleged easement

---

17. We also do not address how artificial accretions or other artificial changes in the coastal landscape affect ownership. *New Jersey v. New York,* 523 U.S. 767, 784, 118 S.Ct. 1726, 140 L.Ed.2d 993 (1998) (explaining the littoral boundaries remained as they were before artificial land-filling increased the surface area of Ellis Island).

previously established did not just encumber the dry beach portion of Severance's parcel, but that it encumbered the entire lot. This is inconsistent with easement law. *See Holmstrom v. Lee*, 26 S.W.3d 526, 533 (Tex.App.-Austin 2000, no pet.) ("Once established, the location or character of the easement cannot be changed without the consent of the parties."); 7 THOMPSON ON REAL PROPERTY § 60.04(c)(1)(ii), at 538–40. While the specific use granted by an easement is a fundamental consideration, there is no law to support the dissent's contention that an easement forever remains in the dry beach (i.e., can move onto a new portion of the parcel or a different parcel) absent mutual consent. *See* JON W. BRUCE & JAMES W. ELY, THE LAW OF EASEMENTS AND LICENSES IN LAND § 7:13, at 7–30 (2009). This would result in depriving oceanfront property owners of a substantial right (the right to exclude) without requiring compensation or proof of actual use of the property allegedly encumbered whenever natural forces cause the vegetation line to move inland so that property not formerly part of the dry beach becomes part of the dry beach. This argument blurs the line between ownership and right to use of a portion of a parcel—the dry beach—and is in tension with our decision in *Luttes* that set the boundary between State and privately owned property at the mean high tide line. *See* 324 S.W.2d at 191–92.

The dissent further dismisses Severance's grievance as a gamble she took and lost by purchasing oceanfront property in Galveston and argues that she would not be entitled to compensation even though an easement had never been established on the portion of her parcel that is now in the dry beach. It notes the OBA requirement of disclosure in sales contracts of the risk that property could become located on a public beach and subject to an easement in the future. *See* TEX. NAT. RES.CODE

§ 61.025. This is incorrect for three reasons. First, beachfront property owners take the risk that their property could be lost to the sea, not that their property will be encumbered by a easement they never agreed to and that the State never had to prove. Second, putting a property owner on notice that the State may attempt to take her property for public use at some undetermined point in the future does not relieve the State from the legal requirement of proving or purchasing an easement nor from the constitutional requirement of compensation if a taking occurs. We do not hold that circumstances do not exist under which the government can require conveyance of property or valuable property rights, such as the right to exclude, but it must pay to validly obtain such right or have a sufficient basis under its police power to do so. *See Nollan*, 483 U.S. at 841–42, 107 S.Ct. 3141 (noting that public use of private beaches may be a "good idea" but "if [the state] wants an easement across [private] property, it must pay for it"). As Justice Oliver Wendell Holmes, Jr. explained, "[A] strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 416, 43 S.Ct. 158, 67 L.Ed. 322 (1922). Third, simply advising in a disclosure that the State may attempt to enforce an easement on privately owned beachfront property does not dispose of the owner's rights.

Our holding does not necessarily preclude a finding that an easement exists. We have determined that the history of land ownership in West Beach refutes the existence of a public easement by virtue of continuous right "in the public since time immemorial, as recognized in law and custom," TEX. NAT. RES.CODE § 61.001(8), and Texas law does not countenance an ease-

ment migrating onto previously unencumbered beachfront property due to the Hurricane. We do not have a sufficient record to determine whether an easement has been proven, and the question was not certified. *See id.*

The public may have a superior interest in use of privately owned dry beach when an easement has been established on the beachfront. But it does not follow that the public interest in the use of privately owned dry beach is greater than a private property owner's right to exclude others from her land when no easement exists on that land. A few states have declared that longstanding property principles give the state (and therefore, the public) the right to all beachfront property or the right to use even privately owned beachfront property *ipse dixit.* For example, the Oregon Supreme Court has held that the dry beach was subject to public use because the public use was inherent in the history of title to such lands. *Stevens v. City of Cannon Beach,* 317 Or. 131, 854 P.2d 449, 456–57 (1993) (citing *State ex rel. Thornton v. Hay,* 254 Or. 584, 462 P.2d 671 (1969)). The state of Oregon's view is that private property owners along the beach "never had the property interests that they claim were taken" in the dry sand, the area between the high water line and vegetation line. *Id.* at 457. The Court explained "the common-law doctrine of custom as applied to Oregon's ocean shores . . . is not 'newly legislated or decreed'; to the contrary, to use the words of the *Lucas* court, it 'inhere[s] in the title itself, in the restrictions that background principles of the State's law of property and nuisance already placed upon land ownership.'" *Id.,* 854 P.2d at 456 (quoting *Lucas v. S.C. Coastal Council,* 505 U.S. 1003, 1004, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992)). The Supreme Court of Hawaii has held that issuance of a Hawaiian land patent confirms only a limited property interest as compared to typical land patents on the continental United States. *See Pub. Access Shoreline Haw. v. Haw. Cnty. Planning Comm'n,* 79 Hawai'i 425, 903 P.2d 1246 (1995) (noting that "the western concept of exclusivity is not universally applicable in Hawai'i"). New Jersey extends the public trust doctrine to encompass the dry beach as well as the wet beach. *See Borough of Neptune City v. Borough of Avon–by–the–Sea,* 61 N.J. 296, 294 A.2d 47, 49 (1972) ("[T]he public trust doctrine dictates that the beach and the ocean waters must be open to all on equal terms and without preference. . . ."); *see also Matthews v. Bay Head Improvement Ass'n,* 95 N.J. 306, 471 A.2d 355, 365 (1984). Unlike the West Beach of Galveston Island, these jurisdictions have long-standing restrictions inherent in titles to beach properties or historic customs that impress privately owned beach properties with public rights.

On the other hand, the Supreme Court of New Hampshire held that a statute that recognized a general recreational easement for public use in the "dry sand area" (comparable to our dry beach), violates the takings provisions of the state and federal constitutions, except for those areas where there is an "established and acknowledged public easement." *Opinion of the Justices,* 139 N.H. 82, 649 A.2d 604, 608 (1994). The public trust ends at the high water mark and private property extends landward beyond that. *Id.* The Supreme Court of Idaho applied the public trust doctrine to Lake Coeur d'Alene and held that the public trust doctrine was inapplicable in an action to force owners to remove a seawall. *State ex rel. Haman v. Fox,* 100 Idaho 140, 594 P.2d 1093 (1979). The private property at issue was obtained by patent from the U.S. Government in 1892 and the seawall was built above the mean high water mark of the lake. *Id.*

A few Texas courts of appeals have reached results contrary to the holding in this opinion. In *Feinman,* the court held that public easements for use of dry beach can roll with movements of the vegetation line. 717 S.W.2d at 110–11. *Feinman* could find no continuous right or custom dating from "time immemorial" or even back to the origins of the Republic or the State of Texas as a basis to encumber private property rights along West Beach. *Id.* *Feinman* states that "[c]ourts have upheld the concept of a rolling easement along rivers and the sea for many years without using the phrase 'rolling easement,'" and cites, but does not discuss, seven cases for its holding.[18] *Id.* at 110. Only one of the opinions is from a Texas court, *Luttes,* and neither it nor the other cited cases discuss rolling or migratory easements. *Luttes* established the landward boundary of title to the public trust along Gulf-front beaches. The *Sotomura* opinion is based on different common law notions of public rights to and limitations on private ownership of beaches in Hawaii, as discussed above. *Cnty. of Haw. v. Sotomura,* 55 Haw. 176, 517 P.2d 57, 61 (1973). *Feinman* neither addressed the legal significance of the Jones and Hall grant on the question of public encumbrance on private beach properties of Galveston's West Beach nor identified any basis in Texas law or history for a continuous legal right or custom on which to ground the existence of a migratory easement. One other appellate decision also recognizes a rolling easement, relying on *Feinman.* *Arrington v. Tex. Gen. Land Office,* 38 S.W.3d 764, 766 (Tex.App.-Houston [14th Dist.] 2001, no pet.).

The first Texas case to address the concept of a rolling easement in Galveston's West Beach is *Matcha v. Mattox,* 711 S.W.2d 95 (Tex.App.-Austin 1986, writ ref'd n.r.e.). In 1983, Hurricane Alicia shifted the vegetation line on the beach such that the Matchas' home had moved into the dry beach. The court held that legal custom—"a reflection in law of long-standing public practice"—supported the trial court's determination that a public easement had "migrated" onto private property. *Id.* at 101. The court reasoned that Texas law gives effect to the long history of recognized public use of Galveston's beaches, citing accounts of public use dating back to time immemorial, 1836 in this case. However, the legal custom germane to the matter is not the public use of beaches, it is whether the right in the public to a rolling easement has existed since time immemorial. The *Matcha* court's recognition of long-standing "custom" in public use of Galveston's beaches misses the point of whether a custom existed to give effect to a legal concept of a rolling beach, which would impose inherent limitations on private property rights. As explained above, the original patent of Galveston's West Beach from the Republic to Jones and Hall refutes the existence of custom, as private owners who purchased beach properties obtained title without limitation on private rights of ownership and without encumbrances for public use.

We disapprove of courts of appeals opinions to the extent they are inconsistent with our holding in this case. *See Arrington v. Tex. Gen. Land Office,* 38 S.W.3d 764, 766 (Tex.App.-Houston [14th Dist.]

18. The cited cases are *Barney v. City of Keokuk,* 94 U.S. 324, 339–40, 24 L.Ed. 224 (1876); *Luttes,* 159 Tex. 500, 324 S.W.2d 167; *Cnty. of Haw. v. Sotomura,* 55 Haw. 176, 517 P.2d 57, 61 (1973); *Horgan v. Town Council,* 32 R.I. 528, 80 A. 271 (1911); *City of Chicago v. Ward,* 169 Ill. 392, 48 N.E. 927 (1897); *Godfrey v. City of Alton,* 12 Ill. 29, 36 (1850); and *Mercer v. Denne,* [1905] 2 Ch. 538 (Eng.). *Feinman* issued two months after *Matcha* and does not cite it for support.

2001, no pet.); *Feinman,* 717 S.W.2d at 108–11; *Moody v. White,* 593 S.W.2d 372, 379 (Tex.Civ.App.-Corpus Christi 1979, no writ); *Matcha,* 711 S.W.2d at 98–100; *See* Neal E. Pirkle, *Maintaining Public Access to Texas Coastal Beaches: The Past and the Future,* 46 BAYLOR L.REV. 1093, 1106–07 (1994) (questioning whether the rolling easement theory should apply to easements by prescription and dedication).

## III. Conclusion

Land patents from the Republic of Texas in 1840, affirmed by legislation in the new State, conveyed the State's title in West Galveston Island to private parties and reserved no ownership interests or rights to public use in Galveston's West Beach. Accordingly, there are no inherent limitations on title or continuous rights in the public since time immemorial that serve as a basis for engrafting public easements for use of private West Beach property. Although existing public easements in the dry beach of Galveston's West Beach are dynamic, as natural forces cause the vegetation and the mean high tide lines to move gradually and imperceptibly, these easements do not migrate or roll landward to encumber other parts of the parcel or new parcels as a result of avulsive events. New public easements on the adjoining private properties may be established if proven pursuant to the Open Beaches Act or the common law.[19]

Justice MEDINA delivered a dissenting opinion, in which Justice LEHRMANN joined.

Chief Justice JEFFERSON did not participate in the decision.

Justice MEDINA, joined by Justice LEHRMANN, dissenting.

Texas beaches have always been open to the public. The public has used Texas beaches for transportation, commerce, and recreation continuously for nearly 200 years.[1] The Texas shoreline is an expansive yet diminishing[2] public resource, and we have the most comprehensive public beach access laws in the nation. Since its enactment in 1959, the Texas Open Beach-

---

19. We have not addressed in this opinion state police power, nuisance or other remedies that may authorize the government to act in the interests of the health, safety and welfare of the public.

1. Historical records indicate that a ferry from Galveston Island at San Luis Pass was established in 1836. *Seaway Co. v. Attorney General,* 375 S.W.2d 923, 931 (Tex.Civ.App.-Houston 1964, writ ref'd n.r.e.). To travel between the City of Galveston Island and the ferry, the public traveled by beach route. *Id.* There is evidence of an established stage coach route traveling across the beach, and on May 23, 1838, the Republic of Texas authorized a mail route to run across the beach, which ran every two weeks. *Id.* Until Termini Road was built in 1956, "the only way to travel, except by private road inland within fenced land, was by way of the beach." *Id.* at 932. Testimony from earlier cases indicates that both locals and visitors to Galveston Island used the entire beach, "from the water line to the line of vegetation[,]" for driving, camping, fishing, and swimming. *Id.* (testimony of lifetime resident born in 1879). Cars parked between the dunes for camping. *Id.* at 933. Finally, there is no evidence that fences were ever erected across any part of the beach, only evidence that they were landward of the vegetation line to prevent cattle from going onto the beach. *Id.* (testimony of lifetime resident since 1875 reasoning that there were no fences because "[n]o one would dream any such thing as to block the driveway, ... and the driveway was in use, I am satisfied, at least more than a hundred years ago"). *Id.*

2. Not only is Texas's coastline expansive, we also have the highest erosion rate in the nation, affecting "five to six feet of sand annually." Michael Hofrichter, *Texas's Open Beaches Act: Proposed Reforms Due to Coastal Erosion,* 4 ENVT'L & ENERGY L. & POL'Y J. 147, 148 (2009). This erosion rate causes coastal property lines to change annually.

es Act ("OBA") has provided an enforcement mechanism for the public's common law right to access and to use Texas beaches.[3] The OBA enforces a reasoned balance between private property rights and the public's right to free and unrestricted use of the beach.[4] Today, the Court's holding disturbs this balance and jeopardizes the public's right to free and open beaches.

After chronicling the history of Texas property law, the Court concludes that easements defined by natural boundaries are, by definition, dynamic. 345 S.W.3d 18. Yet, in a game of semantics, the Court finds that such dynamic easements do not "roll." *Id.* at 38. The Court further distinguishes between movements by accretion and erosion and movements by avulsion, finding that gradual movements shift the easement's boundaries, but sudden movements do not. The Court's distinction protects public beach rights from so-called gradual events such as erosion but not from more dramatic events like storms, even though both events are natural risks known to the property owner. Because the Court's vague distinction between gradual and sudden or slight and dramatic changes to the coastline jeopardizes the public's right to free and open beaches, recognized over the past 200 years, and threatens to embroil the state in beach-front litigation for the next 200 years, I respectfully dissent.

## I. Texas Coastal Property Ownership

Property lines on the coast are defined by migratory, dynamic boundaries. In *Luttes v. State*, we determined that Anglo–American common law applied to land grants after 1840[5] and thus affixed the mean high tide as the boundary between state and private ownership of land abutting tidal waters. 159 Tex. 500, 324 S.W.2d 167 (1958). The beach is common-

3. It is important to note that the OBA only applies to public beaches that border the Gulf of Mexico and are accessible by public road or ferry. Tex. Nat. Res.Code §§ 61.013(c), 61.021.

4. *See* Tex. Nat. Res.Code § 61.0184 (providing procedural safeguards for property subject to OBA enforcement actions). It should be noted that while the General Land Office contacted Severance to tell her that it *might* file an enforcement action to remove her encroachment on the public beach, the Office had not yet initiated such an action at the time of the litigation that gave rise to these certified questions. Justice Wiener's dissent in Severance's federal action is particularly worth noting. He maintains that this action "has the unintentional effect of enlisting the federal courts and, via certification, the Supreme Court of Texas, as unwitting foot-soldiers in this thinly veiled Libertarian crusade" whose quest ends with the evisceration of the Open Beaches Act. *Severance v. Patterson*, 566 F.3d 490, 504 (5th Cir.2009) (Wiener, J., dissenting). He argues further that beyond her claim not being ripe, Severance does not have standing because she attempts "to seek a benefit based on prior state action to which she has not only acceded and thereby forfeited or waived any related claim, but for which she has presumably been remunerated through an intrinsic diminution in the purchase price that she paid when she bought the already burdened beachfront land." *Id.* at 505.

5. Texas adopted the common law in 1840, which established the mean high tide as the boundary dividing the state-owned seashore from private property. *Luttes*, 324 S.W.2d at 169. For land grants or patents that became effective before 1840, Mexican/Spanish civil law applies, which recognized this tidal boundary to be the mean higher high tide. *Id.* Because the mean high tide is measured with tide gauges and calculates both daily high tides, it provides a more definitive boundary line than the mean higher high tide, which only considers the higher of the two daily tides. *Id.* at 187 (recognizing the difficulty in proving "on such and such an occasion in such and such a year or years one or more 'highest waves' actually reached this or that irregular line on the ground").

ly known to lie between the mean low tide and vegetation line. For over fifty years, the OBA has assimilated that common knowledge as a statutory definition as well. All land seaward of the mean high tide,[6] known as the wet beach, is held by the state in public trust. *Luttes*, 324 S.W.2d at 191–93; *see State v. Balli*, 144 Tex. 195, 190 S.W.2d 71, 100 (1945) (recognizing the "ancient maxim that seashore is common property and never passes to private hands"). The land between the mean high tide and the vegetation line is the dry beach and may be privately owned. *Luttes*, 324 S.W.2d at 191–93. I agree with the Court that "[w]e have never held the dry beach to be encompassed in the public trust." 345 S.W.3d 18. If this case were a matter of title, *Luttes* would provide the answer: the mean high tide separates public and private property ownership interests. But this case is about the enforcement of a common law easement that preserves the public's right to access the dry beach.

The mean low tide, mean high tide, and vegetation line are transitory.[7] Landowners may own property up to the mean high tide. But the exact metes and bounds of the beachfront property line cannot be ascertained with any specificity at any given time other than by reference to the mean high tide. Through shoreline erosion, hurricanes, and tropical storms, these lines are constantly moving both inland and seaward. In the West Bay system, whence this litigation arose, forty-eight percent of the shoreline is retreating, forty-seven percent is stable and six percent is advancing, at an average rate of –2.9 feet per year.[8] The beaches on west Galveston Island, where Severance's property is located, have even higher retreat rates (a loss of over seven feet per year) because of their exposure to winds and waves.[9] Natural erosion from waves and currents causes an overall shoreline retreat for the entire Texas coast.[10]

These natural laws have compelled Texas common law to recognize rolling easements.[11] Easements that allow the public

6. "[T]he average of highest daily water computed over or corrected to the regular tidal cycle of 18.6 years." *Luttes* 324 S.W.2d at 187.

7. The mean low tide and high tide are averages assessed over a period of years. Their "actual determination at a given point on the coastline requires scientific measuring equipment and complex calculations extending over a lengthy period. Thus, as a practical matter, such physical determination of the landowner's actual boundary is not normally feasible." Richard Elliott, *The Texas Open Beaches Act: Public Rights to Beach Access*, 28 BAYLOR L.REV. 383, 385 (1976). "The line of vegetation, on the other hand, is readily determinable with the naked eye at most points along the Gulf beaches." *Id.* However, all three lines are subject to the daily movements of ocean, which shift these lines both gradually and suddenly.

8. Gibeaut, J.C., Waldinger, Rachel, Hepner, Tiffany, Tremblay, T.A., and White, W.A., 2003, Changes in bay shoreline position, West

Bay system, Texas: The University of Texas at Austin, Bureau of Economic Geology, report of the Texas Coastal Coordination Council pursuant to National Oceanic and Atmospheric Administration Award No. NA07OZ0134, under GLO contract no. 02–225R, 27 p. 14.

9. *Id.*

10. *Id.*

11. Beginning with the recognition that property bounded by navigable waters is subject to the movements of the shoreline, Texas law has accepted the premise that rolling easements are based upon. *See Luttes*, 324 S.W.2d at 196; *see also Coastal Indus. Water Auth. v. York*, 532 S.W.2d 949, 952 (Tex. 1976). The Open Beaches Act codified the existing public policy that beaches on the Gulf should be free and unrestricted for the public's use and enjoyment. *See* TEX. NAT. RES. CODE §§ 61.011(a). Finally, case law dealing specifically with the enforcement of a public beachfront easement, explicitly recognizes its

access to the beach must roll with the changing coastline in order to protect the public's right of use. The dynamic principles that govern vegetation and tide lines must therefore apply to determine the boundaries of pre-existing public beachfront easements. *See Matcha v. Mattox*, 711 S.W.2d 95, 100 (Tex.App.-Austin 1986, writ ref'd n.r.e.) *cert. denied*, 481 U.S. 1024, 107 S.Ct. 1911, 95 L.Ed.2d 517 (1987) ("An easement fixed in place while the beach moves would result in the easement being either under water or left high and dry inland, detached from the shore. Such an easement, meant to preserve the public right to use and enjoy the beach, would then cease functioning for that purpose"). "The law cannot freeze such an easement at one place anymore than the law can freeze the beach itself." *Id.*

## II. Texas Recognizes Rolling Easements

The first certified question asks whether Texas recognizes rolling beachfront access easements that move with the natural

rolling nature. *Feinman v. State*, 717 S.W.2d 106, 111 (Tex.App.-Houston [1st Dist.] 1986, writ ref'd n.r.e.); *Matcha v. Mattox*, 711 S.W.2d at 99; *Arrington v. Tex. Gen. Land Office*, 38 S.W.3d 764, 766 (Tex. App.-Houston [14th Dist.] 2001, no pet.); *Arrington v. Mattox*, 767 S.W.2d 957, 958 (Tex.App.-Austin 1989, writ denied), *cert. denied*, 493 U.S. 1073, 110 S.Ct. 1119, 107 L.Ed.2d 1026 (1990).

**12.** This concept has long been recognized by courts across numerous jurisdictions. *See Barney v. City of Keokuk*, 94 U.S. (4 Otto) 324, 339–40, 24 L.Ed. 224 (1876) (finding no taking and public use easement boundaries moved after city filled in and expanded street that wharfed out to banks of Mississippi River for public use); *Luttes*, 324 S.W.2d at 167; *Cnty. of Hawaii v. Sotomura*, 55 Haw. 176, 517 P.2d 57, 62 (1973) (defining seaward property boundary to fall on the "upper reaches of the wash of the waves"); *Horgan v. Town Council of Jamestown*, 32 R.I. 528, 80

boundaries by which they are defined. The answer is yes. The rolling easement "is not a novel idea." *Feinman*, 717 S.W.2d at 110. Courts consistently recognize the migrating boundaries of easements abutting waterways to uphold their purpose.[12] *Id.* After all, "an easement is not so inflexible that it cannot accommodate changes in the terrain it covers." *Id.*

The law of easements, Texas law, and public policy support the enforcement of rolling easements. Such easements follow the movement of the dry beach in order to maintain their purpose and are defined by such purpose rather than geographic location. They are therefore affected by changes to the coast but never rendered ineffective by the change. The primary objective is not to ensure the easement's boundaries are fixed but rather that its purpose is never defeated.

### A. Texas Easement Law

An easement is a non-possessory property interest that authorizes its holder to use the property of another for a particu-

A. 271, 276 (1911) (defining boundaries of public highway abutting waterway to be flexible); *City of Chi. v. Ward*, 169 Ill. 392, 48 N.E. 927 (1897) (upholding a statute mandating that lands shall be held for the use and purposes expressed or intended); *Godfrey v. City of Alton*, 12 Ill. 29, 35 (1850) (finding easement by dedication for public landing must attach to the waterway, "however that may fluctuate," otherwise "its enjoyment would be precarious, and often destroyed"); *Mercer v. Denne*, [1905] 2 ch. 538 (Eng.) (recognizing a public easement by custom for fishermen to dry nets on the new portion of the beach that had been added to the old beach overtime); *Louisiana v. Mississippi et al.*, 516 U.S. 22, 25, 116 S.Ct. 290, 133 L.Ed.2d 265 (1995) (applying rule that boundaries between states along a river may naturally shift in accordance with changes in the river channel); *Georgia v. South Carolina*, 497 U.S. 376, 403–04, 110 S.Ct. 2903, 111 L.Ed.2d 309 (1990) (same); *Nebraska v. Iowa*, 143 U.S. 359, 360, 12 S.Ct. 396, 36 L.Ed. 186 (1892) (same).

lar purpose. *Marcus Cable Assocs. v. Krohn,* 90 S.W.3d 697, 700 (Tex.2002). "A grant or reservation of an easement in general terms implies a grant of unlimited reasonable use such as is reasonably necessary and convenient and as little burdensome as possible to the servient owner." *Coleman v. Forister,* 514 S.W.2d 899, 903 (Tex.1974). However, the burden on the servient estate is secondary to ensuring that the purpose of the easement is reasonably fulfilled. For example, oil and gas leases convey an implied easement to use the surface as reasonably necessary to fulfill the purpose of the lease. *See Sun Oil Co. v. Whitaker,* 483 S.W.2d 808, 810 (Tex. 1972) (recognizing that the use easement is not limited by fixed boundaries but rather its purpose and use). The purpose of the easement cannot expand, but under certain circumstances, the geographic location of the easement may. *Compare Marcus Cable Assocs.,* 90 S.W.3d at 701 (preventing easement holder from expanding purpose of maintaining electric transmission or distribution line to also include cable-television lines regardless of fact that lines could be run on exact same geographic location) *with Godfrey v. City of Alton,* 12 Ill. 29, (1850) (recognizing that a public easement for a public landing on specific waterway is necessarily "inseparable from the margin of the water, however that may fluctuate").

Easements may be express or implied. Implied easements are defined by the circumstances that create the implication. *Ulbricht v. Friedsam,* 159 Tex. 607, 325 S.W.2d 669, 677 (1959) (finding an implied easement to use lake water for cattle as they were located upland and without any water source). Express easements, however, must comply with the Statute of Frauds, which requires a description of the easement's location. *Pick v. Bartel,* 659 S.W.2d 636, 637 (Tex.1983). Under certain circumstances, even express easement boundaries may be altered to maintain the purpose of the easement. *See Kothmann v. Rothwell,* 280 S.W.3d 877, 880 (Tex. App.-Amarillo 2009, no pet.) (recognizing movement of drainage tracts to maintain easement's purpose despite the expansion of original easement location); *see also* RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 4.1 (2000) (providing that an easement "should be interpreted to give effect to the intention of the parties ascertained from the language used in the instrument, or the circumstances surrounding the creation of the servitude, and to carry out the purpose for which it was created").

Rolling beachfront access easements are implied by prescription or continuous use of the dry beach and are defined by their purpose and their dynamic, non-static natural boundaries. To apply static real property concepts to beachfront easements is to presume their destruction. Hurricanes and tropical storms frequently batter Texas's coast. Avulsive events are not uncommon. The Court's failure to recognize the rolling easement places a costly and unnecessary burden on the state if it is to preserve our heritage of open beaches.

The Court's conclusion that beachfront easements are dynamic but do not roll defies not only existing law but logic as well. The definition of "roll" is "to impel forward by causing to turn over and over on a surface." Webster's Ninth New Collegiate Dictionary (Merriam–Webster Inc. 1983). "Dynamic" means "of or relating to physical force or energy" and "marked by continuous activity or change." *Id.* Both terms express movement, but neither term is limited by speed or degree of movement.

The Court also illogically distinguishes between shoreline movements by accretion and avulsion. On the one hand, the Court correctly declines to apply the avulsion doctrine to the mean high tide. 345

S.W.3d 18. This means a property owner loses title to land if, after a hurricane or tropical storm, such land falls seaward of the mean high tide. On the other hand, this same hurricane, under the Court's analysis, requires the state to compensate a property owner for the land that now falls seaward of the vegetation line unless it was already a part of the public beachfront easement. Under the Court's analysis, the property line may be dynamic but beachfront easements must always remain temporary; the public's right to the beach can never be established and will never be secure.[13]

The Court's distinctions nullify the purpose of rolling easements. I submit (in accord with several other Texas appellate courts that have addressed the issue of rolling easements) that natural movements of the mean high tide and vegetation line, sudden or gradual, re-establish the dynamic boundaries separating public and private ownership of the beach, as well as a pre-existing public beachfront access easement. So long as an easement was established over the dry beach before the avulsive event, it must remain over the new dry beach without the burden of having to re-establish a previously existing easement whose boundaries have naturally shifted.

Finally, I submit that once an easement is established, it attaches to the entire tract. *Drye v. Eagle Rock Ranch, Inc.*, 364 S.W.2d 196, 207 (Tex.1963). Regardless of how many times the original tract is subdivided, the easement remains. *Id.* (enforcing pre-existing implied easement across subsequently divided tracts to fulfill its purpose).

Private ownership of Galveston Island originated in two land grants issued by the Republic of Texas. First, it arose from the Menard Grant in 1838, which covers the east end of the Island. *See Seaway Co.*, 375 S.W.2d at 928; *City of Galveston v. Menard*, 23 Tex. 349, 403–04 (1859). Second, it issued from the Jones and Hall Grant in 1840, which encompasses 18,215 acres, and includes the West Beach, where Severance's property is located. *See Seaway Co.*, 375 S.W.2d at 928 (covering "all of Galveston Island except the land covered by the Menard Grant covering the east portion of the Island").

The Court today reasons that because no *express* easement was made in these original land grants, no public easement can exist over the dry beach. 345 S.W.3d 18. The Court, however, ignores the implied easement arising from the public's continuous use of the beach for nearly 200 years. The state may have relinquished title in these original grants, but it did not relinquish the public's right to access, use, and enjoy the beach. *See* Ratliff, 13 HOUS. L.REV. at 994 (recognizing that until *Luttes* the public, as well as private landowners, believed beaches to be public domain).

By implied prescription, implied dedication, or customary and continuous use, overwhelming evidence exists that Texans have been using the beach for nearly 200 years. *See Seaway Co.*, 375 S.W.2d at 936 (finding that "owners, beginning with the original ones, have thrown open the beach to public use and it has remained open"); *see also supra* n. 1. This evidence establishes that public beachfront access easements have been implied across this Texas coastline since statehood. As long as a dry beach exists, so too must beachfront access easements. Any other result deprives the public of its pre-existing, domi-

---

**13.** The Court treats the public's easement as "fixed and definite," which creates "a legal fiction that has no factual basis." Mike Ratliff, *Public Access to Receding Beaches*, 13 HOUS. L.REV. 984, 1014 (1976). Only a "rolling easement will realistically and accurately depict the actual occurrences on the beach." *Id.*

nant right to unrestricted use and enjoyment of the public beach.

### B. Texas Case Law

The Court states it is "unaware of any case law permitting such an expansive interpretation of easement rights that would so unduly burden the underlying servient estate." 345 S.W.3d 18 (requiring easements to be re-established over new dry beach after each avulsive event). I submit that Texas case law not only recognizes the existence of public beachfront access easements but further that they "roll" with the movements of their dynamic, natural boundaries.[14]

Before *Luttes*, the public assumed it had unrestricted access to use and enjoy the beach.[15] After *Luttes*, in response to public concern over its right to access Texas beaches, the Texas Legislature passed the OBA to ensure that Texas beaches remained open for public use. Challenged five years later, the Houston Court of Civil Appeals found that a public easement existed on the West Beach of Galveston Island, forcing landowners to remove barriers and structures that prevented the public's access to and use of the public beach. *Seaway Co. v. Attorney General*, 375 S.W.2d at 940; *see also Moody v. White*, 593 S.W.2d 372, 376–79 (finding public easement over dry beach on Mus-

tang Island and requiring removal of structure preventing public access).

In the years following the passage of the OBA, the shoreline naturally and predictably moved both gradually and suddenly. Texas courts have repeatedly held that once an easement is established, it expands or contracts ("rolls"), despite the sudden shift of the vegetation line. *See Feinman*, 717 S.W.2d at 109–10 (after Hurricane Alicia); *Arrington v. Tex. Gen. Land Office*, 38 S.W.3d at 765 (after Tropical Storm Frances); *Brannan v. State*, — S.W.3d —, —, 2010 WL 375921, (Tex.App.-Houston [1st Dist.] 2010, pet. filed) (after unusually high tide or "bull tide"); *Matcha*, 711 S.W.2d at 100 (after hurricane of 1983); *Arrington v. Mattox*, 767 S.W.2d at 958 (after Hurricane Alicia). In short, Texas law has adopted "the rolling easement concept." *Feinman*, 717 S.W.2d at 110–11. The Court's refusal to follow existing Texas law means that every hurricane season will bring new burdens not only on the public's ability to access Texas's beaches but on the public treasury as well.

### C. Texas Public Policy

The OBA codifies the public's pre-existing right of open access to Texas beaches:

---

14. *See Feinman*, 717 S.W.2d at 111 (finding that rolling easement shifted after Hurricane Alicia moved the vegetation line landward causing homes to be seaward of vegetation line and subject to removal under OBA); *Matcha*, 711 S.W.2d at 98–100 (finding public easement shifts with natural movements of the beach); *Arrington v. Tex. Gen. Land Office*, 38 S.W.3d at 766 (affirming summary judgment for Land Office because once public easement is established "it is implied that the easement moves up or back to each new vegetation line"); *Arrington v. Mattox*, 767 S.W.2d at 958 (affirming that the "easement migrates and moves ... with the natural movements of the natural line of vegetation

and the line of mean low tide"); *Moody*, 593 S.W.2d at 379 (recognizing that the boundary lines shift just like navigable rivers but can "be determined at any given point of time"). *See also Mikeska v. City of Galveston*, 451 F.3d 376, 378 (5th Cir.2006) (recognizing public beach easement's "natural demarcation lines are not static" but rather "change with their physical counterparts"); *Hirtz v. Texas*, 974 F.2d 663, 664 (5th Cir.1992) (recognizing location of public beach easement "shifts as the vegetation line shifts").

15. Ratliff, supra n. 13 at 994.

It is declared and affirmed to be the public policy of this state that the public, individually and collectively, shall have the free and unrestricted right of ingress and egress to and from the state-owned beaches bordering on the seaward shore of the Gulf of Mexico, or if the public has acquired a right of use or easement to or over an area by prescription, dedication, or has retained a right by virtue of continuous right in the public, the public shall have the free and unrestricted right of ingress and egress to the larger area *extending from the line of mean low tide to the line of vegetation bordering on the Gulf of Mexico.*

TEX. NAT. RES.CODE § 61.011(a) (emphasis added). Migratory boundaries define rolling easements, rather than fixed points. The line of vegetation is "the extreme seaward boundary of natural vegetation which spreads *continuously* inland." TEX. NAT. RES.CODE § 61.001(5) (emphasis added). Public beach means

> any beach area, whether publicly or privately owned, extending inland from the line of mean low tide to the line of vegetation bordering on the Gulf of Mexico to which the public has acquired the right of use or easement to or over the area by prescription, dedication, presumption, or has retained by virtue of continuous right in the public since time immemorial, as recognized in law and custom.

TEX. NAT. RES.CODE § 61.001(8). The OBA recognizes the dynamic nature of beach boundaries by defining the public beach by reference to the vegetation line and tide lines, which shift with the movements of the ocean, whether those movements are gradual from erosion or dramatic from storm events. Requiring that existing easements be re-established after every

hurricane season defeats the purpose of the OBA: to maintain public beach access.

### i. Disclosure of Risk Requirement

For almost twenty-five years, the state has taken the further step of informing beachfront property purchasers of the rolling nature of the easement burdening their property. Amendments to the OBA in 1985 make "pellucid that once an easement on the dry beach is established, its landward boundary may therefore 'roll,' *including over private property*". *Severance v. Patterson*, 566 F.3d 490, 506 (5th Cir.2009) (Wiener, J., dissenting) (emphasis in original); see also Act of May 24, 1985, 69th Leg., R.S., ch. 350, § 1, 1985 Tex. Gen. Laws 1419 (codified as TEX. NAT. RES.CODE § 61.025). Sellers of property on or near the coastline are required to include in the sales contract a "Disclosure Notice Concerning Legal and Economic Risks of Purchasing Coastal Real Property Near a Beach." TEX. NAT. RES.CODE § 61.025(a). The notice specifically warns that

> If you own a structure located on coastal real property near a gulf coast beach, it may come to be located on the public beach *because of coastal erosion and storm events....* Owners of structures erected seaward of the vegetation line (or other applicable easement boundary) or that *become seaward of the vegetation line as a result of natural processes* such as shoreline erosion are subject to a lawsuit by the State of Texas to remove the structures.

TEX. NAT. RES.CODE § 61.025(a) (emphasis added). The language of the Act itself clearly identifies the line of vegetation as an easement boundary and clearly recognizes the transient nature of these boundary lines. The vegetation line, "given the vagaries of nature, will always be in a state of intermittent flux[,]" and consequently, "[s]hifts in the vegetation line do not cre-

ate new easements; rather they expand (or in the case of seaward shifts, reduce) the size and reach of one dynamic easement." *Severance v. Patterson,* 566 F.3d 490, 506 (5th Cir.2009) (Wiener, J., dissenting). Severance purchased her properties with contracts that notified her of these risks and nature of the rolling easement.

### ii. Constitutional Amendment Adopting the Open Beaches Act

In November 2009, Texans adopted a constitutional amendment that mirrors the policy and language of the OBA. The amendment adopts the OBA's definition of "public beach" and reiterates that the public's easement is established under Texas common law. TEX. CONST. art. I, § 33(a). It further acknowledges the permanent nature of the easement. *Id.* at § 33(b). To be consistent with the Texas Constitution, these easements must roll with the natural changes of the beach. The Court's failure to recognize the rolling nature of these easements is thus not only contrary to common law and the public policy of the state but also the will of the people expressed in our constitution.

### iii. Presumption of Public Easement Over Dry Beach

Finally, in an OBA enforcement action, there is a presumption that the public has acquired an easement over the dry beach, and a landowner like Severance may present evidence to rebut the presumption. *See* TEX. NAT. RES.CODE § 61.020. The "title of the littoral owner does not include the right to prevent the public from using the area for ingress and egress to the sea[,]" and "there is imposed on the area [from mean low tide to the line of vegetation] a common law right or easement in favor of the public for ingress and egress to the sea." *Id.* Once a public beach easement is established, it is implied that

the easement moves up or back to each new vegetation line, and the state is not required to repeatedly re-establish that an easement exists up to that new vegetation line. *See Arrington v. Tex. Gen. Land Office,* 38 S.W.3d at 766.

### III. Rolling Easements Are Creatures of Texas Common Law

The answer to the second certified question is that the common law rather than the OBA is the source of public beachfront access easements. The OBA, however, is consistent with the common law of rolling easements and faithfully articulates the longstanding policy of the state. The OBA is not a rights-creating document but a mechanism for enforcing property rights that the state has previously and independently obtained. *See Arrington v. Mattox,* 767 S.W.2d at 958. Such easements are established by prescription, dedication, or customary and continuous use. Guided by the common law, "[t]he OBA safeguards the public's common law easement[,]" protecting the public's access to public beaches. *Mikeska v. City of Galveston,* 451 F.3d 376, 378 (5th Cir.2006) (citing TEX. NAT. RES.CODE § 61.001(8)).

### IV. No Compensation Owed to Beachfront Property Owners Whose Property Is Encumbered by a Rolling Easement

The third certified question asks whether compensation is owed to landowners whose property becomes subject to a public beachfront access easement after it rolls with natural shifts in the shoreline. When an act of nature destroys a piece of coastal property, no compensation is owed because there is no taking by the government. Likewise, when an act of nature changes the boundaries of the beach, no compensation is owed when the government seeks to protect the already existent public right of access to the beach. The

government is merely enforcing an easement whose boundaries have shifted. The enforcement of rolling easements does not constitute a physical taking nor does it constitute a regulatory taking. Pre-existing rolling easements affect a property right that the landowner never owned, namely, excluding the public from the beach. Because no property is taken, no compensation is owed.

### A. No Physical Taking

The Texas Constitution guarantees that "[n]o person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person." TEX. CONST. art. I § 17. Texas landowners may assert an inverse condemnation claim "when the government physically appropriates or invades the property, or when it unreasonably interferes with the landowner's right to use and enjoy the property." *Westgate Ltd. v. State*, 843 S.W.2d 448, 452 (Tex.1992). By enforcing a pre-existing rolling easement, the state is not physically taking private property.

For property purchased after October 1986, landowners were expressly warned that a preexisting public easement of the dry beach restricts the landowner's right to develop, maintain, or repair structures that would prevent the public from using and accessing the public beach. *See* TEX. NAT. RES.CODE § 61.025. The right to exclude the public from the dry beach was never in the landowner's bundle of sticks when she purchased the property.[16] With such express notice, the state's enforcement of the public easement cannot be said to diminish the landowner's reasonable in-

vestment-backed expectations. *See Penn. Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 130–31, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). The state owes no compensation for a property right that the landowner does not actually possess.

For property purchased before 1986, enforcement of a pre-existing rolling easement also does not constitute a physical taking. First, rolling easements are rooted in the common law as a single easement with dynamic boundaries. The public beach has been "historically dedicated to the public use." *Brannan*, ⸺ S.W.3d at ⸺. It is not state action that subjects beachfront property to this rolling easement but rather a *force majeure*. *Id.* The state merely enforces what has long been established in the common law. Almost every case addressing this issue agrees there is no taking and that the landowner should bear the risks assumed by purchasing property near the beach. "There is nothing in the [OBA] which seeks to take rights from an owner of land.... [I]t merely furnishes a means by which the members of the public may enforce such collective rights as they may have legally acquired by reason of dedication, prescription or which may have been retained by continuous right." *Seaway Co.*, 375 S.W.2d at 930; *see Arrington v. Mattox*, 767 S.W.2d at 958; *Moody*, 593 S.W.2d at 379; *Brannan*, ⸺ S.W.3d at ⸺–⸺.

### B. No Regulatory Taking

The enforcement of rolling easements does not constitute a regulatory taking. "When the owner of real property has

---

**16.** Severance purchased her property in 2005, and thus her land sales contract contained this express deed restriction. Severance was also put on notice before the purchase on two separate occasions. In 1999, the General Land Office released a list of homes, includ-

ing Severance's, that were located seaward of the vegetation line following Tropical Storm Frances. In 2004, the property was again listed as being on the public beach but subject to a two-year moratorium order.

been called upon to sacrifice all economically beneficial use in the name of the common good, that is, to leave his property economically idle, he has suffered a taking." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (establishing the total takings test).[17] But there are two exceptions. First, if the regulation restricts a use the owner does not have in his title, no taking has occurred. *Id.* at 1027, 112 S.Ct. 2886. Second, if state common law nuisance and property principles prohibit the desired use of the land, no taking has occurred. *Id.* at 1029, 112 S.Ct. 2886.

The first exception certainly applies to property purchased after 1986. As explained above, the landowner cannot receive compensation for a property right that she never owned. Beachfront property purchasers whose sales contracts contained such a deed restriction never owned the right to exclude the public from using and enjoying the dry beach.

The second exception involves the state's common law nuisance laws and other background property principles that prohibit or restrict the landowner's specific use of property. As explained above, the rolling easement is rooted in background principles of Texas common law and is supported by the OBA and the Texas Constitution. Due to natural processes, as land moves seaward of the vegetation line, that strip of land becomes subject to the pre-existing public easement established by either prescription, dedication, or continuous and customary use. This strip of land is the servient estate, encumbered by the dominant estate, the rolling easement, to

reasonably fulfill its stated purpose. *Drye v. Eagle Rock Ranch, Inc.*, 364 S.W.2d 196, 207 (Tex.1963). The common law has always restricted a landowner's use of the dry beach. *Arrington v. Mattox*, 767 S.W.2d at 958 (citing Texas cases that found no taking and recognizing "fundamental distinction between a governmental taking of an easement through an act of sovereignty and judicial recognition of a common law easement acquired through historical public use"); *see Lucas*, 505 U.S. at 1028–29, 112 S.Ct. 2886 (finding enforcement of existing easement not a taking).

## C. Texas Nuisance Law

Texas nuisance laws permit the enforcement of rolling easements without requiring compensation. This area of the law imposes a general limitation on landowners. Property owners may not use their property in a way that unreasonably interferes with the property rights of others. *See Schneider Nat. Carriers, Inc. v. Bates*, 147 S.W.3d 264, 269 (Tex.2004). An action that does not begin as a nuisance may nevertheless become a nuisance due to changing circumstances. *See Atlas Chem. Indus., Inc. v. Anderson*, 524 S.W.2d 681, 685–86 (Tex.1975) (finding that heavy rains causing previously discharged pollutants from upstream manufacturing plant to spread more broadly across downstream land to be a nuisance). Movements of the coast change circumstances and thus affect property rights of both private beachfront owners and the public. As a result, a beach house that moves seaward of the vegetation line because of natural changes to the coast becomes a nuisance, restrict-

---

**17.** After the *Lucas* decision, which found a taking, and Hurricane Hugo, the South Carolina Legislature amended their Beach Management Act to incorporate a rolling easement on any lot that moved seaward of the setback line, specifically to avoid takings claims. The easement permits some struc-

tures but maintains the right to implement some erosion control methods. National Oceanic and Atmospheric Administration, *Erosion Control Easements*, http://coastal management.noaa.gov/initiatives/shoreline_ppr_easements.html. (last visited Nov. 3, 2010).

ing the public's ability to use and enjoy the beach.

In this unique area of property law, rolling beachfront easements are unlike any other type of easement abutting a waterway. They are not only subject to the ebb and flow of the tide, but also the ocean's surging waves. The ocean is unlike any other body of water.[18] The primary movement of the coastline is through hurricanes and tropical storms.[19] Requiring the state to re-establish public beach easements after storms places an unreasonable burden on the state, a burden that was actually assumed by the landowner who purchased property near the beach.

## V. Conclusion

The Texas coastline is constantly changing and the risks of purchasing property abutting the ocean are well known. The OBA further mandates the disclosure of these risks in coastal purchase contracts. Insurance is available for some of these risks.[20] It is unreasonable, however, to require the state and its taxpayers to shoulder the burden of these risks. In my view, coastal property is encumbered by a pre-existing rolling easement rooted in the common law. The state is not responsible for the ocean's movement and therefore owes no compensation when enforcing this existing easement. Because the Court requires the state to re-establish its easement after avulsive events and to pay landowners for risks they have voluntarily assumed, I must dissent. I would instead follow the constitution and the long-standing public policy of this state and hold that the beaches of Texas are, and forever will be, open to the public.

PER CURIAM.

Pursuant to article V, section 3–c of the Texas Constitution and Texas Rule of Ap-

---

18. The Court correctly declines to apply the traditional avulsion rule to the mean high tide boundary established in *Luttes*. I would also extend this to the vegetation line. The reason avulsion does not change title on rivers does not extend to coastline. Generally, avulsive events create an entirely new river bed, and "just as a stone pillar constitutes a boundary, not because it is a stone, but because of the place in which it stands, so a river is made the limit of nations [or states], not because it is running water bearing a certain geographical name, but because it is water flowing in a given channel, and within given banks, which are the real international boundary." *Nebraska v. Iowa*, 143 U.S. 359, 362, 12 S.Ct. 396, 36 L.Ed. 186 (1892). However, the running water at issue is the Gulf of Mexico, and it does not flow in a given channel *between* banks but rather constantly washes against the beaches. Here, the "stone pillar" is the Gulf of Mexico, and it stands as the boundary, not because of its specific, fixed location, but rather because it is the Gulf. Further, avulsive events on rivers merely cuts a new river bed, separating identifiable land from its original tract. Here, when an avulsive event occurs on the beach, there is no identifiable land. Rather, the previous beach becomes entirely submerged under the Gulf, and land previously above the vegetation line is now seaward of it.

19. Since 1851, Galveston Island has endured more than fifty tropical storms and at least twenty-three hurricanes. The worst hurricane of the nineteenth century, however, was on October 6, 1837, leaving a two thousand mile destruction path. The Hurricane of 1900, "The Great Storm," still holds title as the deadliest natural disaster to strike the United States. It claimed the lives of at least eight thousand and left thirty thousand homeless. In 1983, Hurricane Alicia eroded fifty to two hundred feet of Galveston's coastline.

20. The National Flood Insurance Program, and the Texas counterpart, the Texas Windstorm Insurance Association, helps shield beachfront property owners from the risks of a naturally changing coastline. Hofrichter, M., *Texas's Open Beaches Act: Proposed Reforms Due to Coastal Erosion*, 4 Envt'l & Energy L. & Pol'y J. 147, 151 (2009). Also, the U.S. Tax Code provides for certain casualty loss deductions for buildings damages from storms along the coast. *Id.* at 150 (citing I.R.C. § 165).

pellate Procedure 58.1, this Court agreed to answer questions of state law certified from the United States Court of Appeals for the Fifth Circuit. We issued the opinion on November 5, 2010. We later granted rehearing. While rehearing was pending, Appellant Carol Severance sold the property at issue to the City of Galveston in a Federal Emergency Management Agency buyout program for homes damaged by Hurricane Ike. Appellees contend that Severance's sale of the real property renders moot both the underlying lawsuit and our consideration of the certified questions on rehearing, and warrants vacating the original opinion. Severance disputes these contentions. The parties have notified the United States Court of Appeals for the Fifth Circuit of the sale.

The determination whether the federal lawsuit is moot must be made by the Fifth Circuit. We abate our consideration on rehearing of the certified questions pending this mootness determination.

Chief Justice JEFFERSON did not participate in the decision.