# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-19-00848-CR

**Derek Grinstead, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE 390TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-DC-18-207262, THE HONORABLE JULIE H. KOCUREK, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Derek Grinstead was convicted by a jury of the first-degree felony offense of aggravated sexual assault and sentenced by the trial court to fifty years' confinement in the Texas Department of Criminal Justice. *See* Tex. Penal Code §§ 12.32, 22.021. In a single issue, Grinstead alleges that the trial court abused its discretion by permitting his waiver of counsel at trial. We will modify the judgment of conviction to correct two typographical errors and affirm the judgment as modified.

## BACKGROUND

Grinstead was indicted by a grand jury on six counts of aggravated sexual assault on November 27, 2018. He was found indigent and appointed counsel. On May 30, 2019, Grinstead filed a pro se motion to dismiss counsel, alleging that his attorney had failed to file certain pre-trial motions, that Grinstead had lost faith in his counsel and no longer trusted his advice, and that there existed "an irreparable, antagonistic relationship" between the two.

On July 9, 2019, Grinstead filed a letter with the trial court, further explaining his reasons for wanting to dismiss his counsel. He alleged that his attorney had threatened him on numerous occasions but that he had been afraid to bring the threats to the court's attention because they were made behind closed doors, and he was concerned about attorney-client privilege. He also alleged that counsel had insulted him and invaded his personal space. Grinstead asserted that, as a result of counsel's actions, he had filed a grievance with jail officials and was looking into contacting the State Bar.

The trial court did not rule on Grinstead's motion, and he proceeded to trial with appointed counsel. At his initial arraignment, Grinstead informed the trial court that, while he did not want to "void attorney-client privilege," he did not feel he was being represented properly by counsel. He alleged that in nine months his attorney had communicated with him for approximately twenty-five minutes, an assertion disputed by counsel.

At trial, Sergeant Ryan Herring with the Austin Police Department ("APD") testified that he was dispatched around 7 a.m. on the morning of October 22, 2018, to a "sex crimes urgent call" at Palm Beach Tan at the Southpark Meadows Shopping Center. He received a suspect description of a "short Hispanic male wearing a white T-shirt and blue jeans" and saw an individual matching the description walking in a parking lot across the street from the tanning salon. The suspect, who Herring identified in court as Grinstead, began to run when Herring approached him, as seen in Herring's body camera footage, which was admitted at trial. Herring testified that although he turned on his taser, no force was used in apprehending Grinstead. He explained that Grinstead, who fell while being chased, was "yelling for no reason" while on the ground. In the footage, Grinstead, though untouched, can be heard shouting, "Get him off

2

of me." While Grinstead was on the ground, a knife fell out of his pocket. Herring had been informed that a knife was used in the offense.

Brian Frnka, the salon's owner, testified that he was informed of the incident while driving to the salon. After arriving, he reviewed security footage from cameras in the salon's lobby on his phone. Frnka testified that he saw an individual in a white hooded sweatshirt try the door to the salon, see that it was open, take off his sweatshirt, place it behind a pillar in front of the door, and enter, heading straight to the back where the complainant, Lisa Stone,[1] was setting up for the day. Less than ten minutes later, Frnka saw the individual emerge from the back and leave, zipping up his pants. Frnka took screenshots of the footage from his phone, which were admitted into evidence. He explained that the footage rolls off the DVR every 14 days, and the security company was unable to retrieve it in time.

The court recessed after Frnka's testimony. Outside the presence of the jury, Grinstead complained that counsel would not ask certain questions and was "hollering" at him "in back, back out there," telling Grinstead he was guilty. He also alleged that counsel had called him a liar and "a homeless meth head." Grinstead's attorney denied the accusations in response to questioning from the trial judge, who asked counsel to explain his reasoning for not asking the questions requested by Grinstead. Grinstead also protested counsel's refusal to emphasize the State's failure to introduce footage of Stone entering the salon and preparing to open the business. Counsel explained that the footage, if it existed, would not be relevant and noted that he and Grinstead had discussed why he was "not going there" in privileged

---

[1] Lisa Stone is a pseudonym used to protect the identity of the complainant. *See* Tex. Const. art. I, § 30 ("A crime victim has the . . . right to be treated with fairness and with respect for the victim's dignity and privacy"); Tex. Code Crim. Proc. art. 58.152 (providing for use of pseudonym in order to maintain confidentiality of files and records of victim of sexual assault).

conversations. Grinstead concluded by again asserting to the trial court that he believed counsel was not representing him properly.

Following the recess, Stone testified that as she walked from her car, she saw a man she believed to be homeless sitting on the curb in front of the salon wearing a white hooded sweatshirt and jeans. She went to the office at the back of the store to begin opening procedures and heard the door chime twice. The second time, she saw the man from the curb walking down the hallway toward her. She asked the man if he needed help with anything, and he pulled a closed pocketknife from his pocket and ordered her into a room. Stone complied, believing the man would kill her if she did not. The man placed the knife on a shelf within easy reach, forced Stone to engage in oral sex, and "put his penis in [her]." Afterward, he slapped her in the face, told her she was "a stupid girl for leaving the doors unlocked," and left. Stone testified that the man smelled "gross," like he had not showered recently. She did not know him and had never seen him before. After officers arrested Grinstead in the parking lot near the salon, Stone was driven to the location, where she made a field identification of Grinstead as her assailant. She also identified Grinstead in court and matched the knife found during the arrest with the one used in the assault.

APD Detective Leticia Solis testified that she spoke with Frnka at the scene and viewed the salon's surveillance footage on his phone. As the footage played on the phone, Solis recorded it with her body camera. Thus, while the original footage from the lobby cameras was not preserved, Solis's body camera footage was admitted into evidence. The video as recorded by Solis's body camera was consistent with the description of the surveillance video provided in Frnka's testimony.

4

Amanda Brookshire, a forensic nurse with SAFE Alliance, testified that she conducted a sexual assault forensic examination ("SAFE") on Stone, as part of which she collected 14 swabs. Brookshire noted that there were no markings on Stone's face. She also testified that Stone did not exhibit vaginal trauma, the absence of which she explained was "very common" in sexual assault cases.

Ashley Foster, a forensic DNA analyst at Signature Science, analyzed the swabs collected by Brookshire. She testified that the sperm cell fraction of the cervical and anal swabs indicated a single source male DNA profile that matched Grinstead's DNA profile. The sperm cell fraction of the oral swab was a mixture of two individuals with one male contributor. Assuming Stone was a contributor, a single source male DNA profile was deduced which matched Grinstead's DNA profile. For each swab, Foster explained the probability of randomly selecting an unrelated individual matching the DNA profile: "For the African American U.S. population database, it's 1 in 1.84 decillion. For the Caucasian U.S. population database, it's 1 in 2.97 nonillion. For the Hispanic U.S. population database, it's 1 in 747 octillion." Following Foster's testimony, the State rested its case-in-chief.

For the defense's case-in-chief, Grinstead testified against the advice of counsel, arguing that the encounter was consensual. According to Grinstead, he had been homeless for three or four days at the time of the offense. Prior to that, he had spent a couple of days with family in Bastrop after getting out of jail. He testified that on the morning of October 22, 2018, he saw Stone, who was on the phone, at a bus stop near the salon and asked her for money. She replied, "Maybe, after I open up," and nodded toward the shopping center. Grinstead waited in front of the salon and saw Stone come to the door. She did not seem to recognize him, which he attributed to his jacket, so he took it off. A few minutes later, he saw her on her phone in the

5

hallway and entered the store. He stated that he put his hands on her waist, and she smiled at him. When he asked her if she wanted to go into one of the tanning rooms, she replied, "For what?" Grinstead testified that he "grabbed [him]self" and put a hand on her buttocks. He alleged that she then followed him into the room, and the two had intercourse. He testified that while he was taking off his pants, his knife fell out of his pocket, and he put it on a nearby shelf. After they had sex, he called her a "slut," which he insisted was "not necessarily as derogatory as it sounds," and she became "a little aggravated." He pulled up his pants, laughed at her facial expression, and left. Grinstead maintained that he did not slap Stone or threaten her with the knife. He testified that after leaving he walked around looking for a lighter but ran when he heard Sergeant Herring call out to him because he is "kind of scared of cops."

On cross-examination, Grinstead testified that Stone could have said "no" had she wanted to do so. When the State asked why Stone had called 911 within five minutes of his leaving if the encounter had been consensual, he explained that he had not been in a "position to assume that she was such a timid person that she smiles when she [sic] nervous." Alternatively, he posited that she regretted the encounter after he called her a slut and laughed at her. Grinstead confirmed that he had not been tased or touched by officers but was yelling because he was scared. He also insisted that he wanted to draw attention to himself in case the officer shot him.

Grinstead denied that he had been under the influence of drugs during the offense. He explained that he had not used meth in three days and had been out of marijuana that day. Lastly, he admitted that he had given a different account of events while speaking with his brother by phone following his arrest. He insisted that his claim that he had known Stone "before" and was her "bad boy on the side" was to prevent his cellmates, whom he described as "vultures," from assaulting him.

6

After the State's closing argument, Grinstead asked the trial court, "Can I represent myself?" The trial judge excused the jury and conducted a *Faretta* hearing. Grinstead asserted that he understood both his rights to counsel and to represent himself and wanted to represent himself in closing argument. The trial judge explained that lawyers receive training and attend law school to learn about the rules of evidence and trial procedures, which Grinstead acknowledged he understood. In response to questioning from the judge, Grinstead noted that he had gone to school "to the 10th grade" but did not receive a GED. The trial judge confirmed that he was proficient in English. Grinstead stated that he had "some" courtroom experience but "not a lot" and "never at trial." He described the purpose of closing argument as "[t]o inform the jury of the evidence presented and let them know your thoughts." He affirmed that he had heard the charge, "paid attention," and knew with what he was charged. He correctly gave the punishment range for the offense and stated that he had been charged with three counts, to which the trial judge responded, "You were charged with six, but we've combined them into three."

The trial judge once more admonished Grinstead that she did not believe self-representation was in his best interest. He replied, "It's my choice," and the judge appointed Grinstead's attorney as standby counsel, explaining, "[H]e can't take over. This is going to be up to you to do the closing arguments." The judge also cautioned Grinstead that he would have to follow the Rules of Evidence, or the State would object, and she could not give him any breaks because he had not been to law school. The judge also ensured that he was aware that he would be required to represent himself at sentencing, to which he replied, "If it goes to sentencing."

Despite Grinstead's protestation that it would not be helpful, the trial judge gave him five minutes to discuss the decision with counsel in private. After the recess, the judge asked counsel whether he believed Grinstead was competent, to which he assented. Grinstead

7

confirmed that no one was forcing him to waive counsel, and the trial court found that he was making a "knowing and voluntary exercise of his right to counsel or right to waive his counsel and represent himself."

In his closing argument, Grinstead largely reasserted his claim that the encounter was consensual. Noting that Stone had testified that he did not open the pocketknife, he argued, "Reasonable? No. Predator would open it." He once more explained that he had shown through his words and actions that he was propositioning Stone for sex and that she had said, "Okay," and smiled. And he again suggested that she had called 911 because she was a "woman scorned" and felt humiliated and disgusted following the encounter. He denied that he had hit or verbally threatened Stone and stated that she had only seen the knife when it fell out of his pocket. In support of his assertion, he noted that Brookshire had testified that Stone had no visible marks on her face. He also observed that had he assaulted Stone, he would not have wandered around the area afterward. Lastly, he elaborated on his reasons for wanting to represent himself at closing:

> I testified yesterday and what I'm here to do, this was always the plan. The whole time this was all I had going for me . . . . And this moment is what I've been waiting for for a year and seven days. I was going to let them play out everything they had. And I'm just going to sit there to let all the lawyers do all that work and I was going to hold on to this until I got my shot. Or tell people -- 13 people that don't know me, don't know her, don't assume too much just because I'm down.

The jury found Grinstead guilty on all counts and, for each count, found that he had used or exhibited a deadly weapon. Grinstead had elected for the trial court to assess punishment, and the court sentenced him to fifty years' confinement.

**DISCUSSION**

In a single issue, Grinstead contends that the trial court abused its discretion by permitting him to waive his right to counsel at trial because the waiver was not made competently, knowingly, intelligently, and voluntarily.

### Knowing, Intelligent, and Voluntary

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI; *Gideon v. Wainwright*, 372 U.S. 335, 340–45 (1963). The Amendment also includes the reciprocal right to self-representation.[2] *Faretta v. California*, 422 U.S. 806, 818 (1975); *Williams v. State*, 252 S.W.3d 353, 356 (Tex. Crim. App. 2008). The two rights are "mutually exclusive" and their "'clash' can create difficult situations for trial courts." *Grant v. State*, 255 S.W.3d 642, 645 (Tex. App.—Beaumont 2007, no pet.). The right to counsel is "fundamental," and courts "indulge every reasonable presumption against waiver." *Williams*, 252 S.W.3d at 356.

A defendant's assertion of the right to self-representation must therefore be unconditional, unequivocal, and not made to disrupt or delay the proceedings. *Ex parte Winton*, 837 S.W.2d 134, 135 (Tex. Crim. App. 1992); *Funderburg v. State*, 717 S.W.2d 637, 642 (Tex. Crim. App. 1986) ("[T]he right to self-representation does not attach until it has been clearly and unequivocably asserted."). The decision to waive counsel and proceed pro se must also "be made (1) competently, (2) knowingly and intelligently, and (3) voluntarily." *Moore v. State*,

---

[2] The right to self-representation is also protected by state law. *See* Tex. Const. art. I § 10 (guaranteeing defendant "the right of being heard by himself or counsel"); *Chadwick v. State*, 277 S.W.3d 99, 103 (Tex. App.—Austin 2009), *aff'd*, 309 S.W.3d 558 (Tex. Crim. App. 2010).

999 S.W.2d 385, 396 (Tex. Crim. App. 1999) (internal citations omitted); *accord Robinson v. State*, 16 S.W.3d 808, 813 n.6 (Tex. Crim. App. 2000). The decision is made "knowingly and intelligently" if it is made "with a full understanding of the right to counsel, which is being abandoned, as well as the dangers and disadvantages of self-representation." *Collier v. State*, 959 S.W.2d 621, 626 (Tex. Crim. App. 1997); *see Hatten v. State*, 71 S.W.3d 332, 333 (Tex. Crim. App. 2002). It is made "voluntarily" if it is uncoerced. *Moore*, 999 S.W.2d at 396 n.5.

In admonishing the defendant of the risks of self-representation, the trial court should "include an effort to ensure that the defendant is aware of the practical disadvantages of representing himself." *Johnson v. State*, 760 S.W.2d 277, 279 (Tex. Crim. App. 1988). "The defendant should be aware that there are technical rules of evidence and procedure, and he will not be granted any special consideration solely because he asserted his pro se rights." *Id*. As the Supreme Court held in *Faretta*, "his eyes should be open to the fact that, while it is undoubtedly his right, he is about to embark on a risky course." *Id*.; *see Faretta*, 422 U.S. at 835 (explaining that record should establish that defendant "knows what he is doing and his choice is made with eyes open") (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)). To make a valid waiver, the defendant must apprehend "the nature of the charges against him." *Rodriguez v. State*, 491 S.W.3d 18, 27 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd).

The trial court, in assessing the effectiveness of a waiver, must consider the totality of the circumstances. *Williams*, 252 S.W.3d at 356. "This means that courts must examine the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Id*. (internal quotation marks omitted). The information a defendant must possess in order to make an intelligent decision depends on "a range of case-specific factors, including the defendant's education or sophistication, the complex or easily

10

grasped nature of the charge, and the stage of the proceeding." *Iowa v. Tovar*, 541 U.S. 77, 88 (2004). *Faretta*, however, does not mandate an inquiry into a defendant's age, education, background, or previous mental health history where the record is otherwise sufficient for the court to "make 'an assessment of his knowing exercise of the right to defend himself.'" *Martin v. State*, 630 S.W.2d 952, 954 (Tex. Crim. App. 1982) (quoting *Faretta*, 422 U.S. at 836); *accord Blankenship v. State*, 673 S.W.2d 578, 583 (Tex. Crim. App. 1984). Although a trial court must take an "active role" in assessing a defendant's waiver, "no set formula or script exists for trial courts to follow when admonishing the defendant about the dangers of representing himself." *Cole v. State*, 590 S.W.3d 1, 6 (Tex. App.—Beaumont 2019, no pet.). Technical legal knowledge is not relevant in determining whether a defendant's decision to exercise his right to self-representation was knowing. *Faretta*, 422 U.S. at 836. In other words, "a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation." *Id.* at 835; *see Dunn v. State*, 819 S.W.2d 510, 523 (Tex. Crim. App. 1991) ("It is not a requirement that the appellant have the skill and experience of an attorney before he is able to embark on this venture."). When the record does not show that an appellant was sufficiently admonished as required by *Faretta*, "it is reversible error not subject to a harm analysis." *Williams*, 252 S.W.3d at 357.

The record reflects that the trial court sufficiently admonished Grinstead regarding the risks, dangers, and disadvantages of self-representation and ensured that he understood the nature of the charges against him. The *Faretta* hearing opened with the following colloquy:

> THE COURT: Okay. Mr. Grinstead, are you sure that you would like to represent yourself?
>
> THE DEFENDANT: Yes, ma'am.

11

> THE COURT: You have a Constitutional right to represent yourself and you also have a Constitutional right to have counsel. Do you understand that?
>
> THE DEFENDANT: Yes, ma'am.
>
> THE COURT: And what are you asking the Court to do?
>
> THE DEFENDANT: To let me represent myself in my closing argument.

The trial judge explained that "lawyers are trained and go to law school for three extra years out of college to know about the Rules of Evidence and the procedures that are in a trial," which Grinstead stated he assumed and understood. The judge further clarified, "These are things that I have to explain to you and make sure you know before you represent yourself." Exploring the background factors listed in *Faretta*, the trial judge inquired into Grinstead's education, English proficiency, and courtroom experience. Grinstead answered that he had attended school "to the 10th grade," did not have a GED, could speak the English language, and had spent "some" time in courtrooms but "never at trial." When asked if he knew the purpose of a closing argument, Grinstead replied, "To inform the jury of the evidence presented and let them know your thoughts." He stated that he had been charged with three counts, to which the trial judge responded, "You were charged with six, but we've combined them into three." Grinstead correctly gave the punishment range for the offense as five to ninety-nine years.

Following the court's questioning, the trial judge attempted once more to dissuade Grinstead:

> THE COURT: Okay. I am going to warn – I don't think it's in your best interest to represent yourself. I want to make that clear to you, okay. But you do have the Constitutional right to do so. Is it your choice that you want to?
>
> THE DEFENDANT: It's my choice.
>
> . . .

THE COURT: And there are certain Rules of Evidence; and if you do not abide by those certain Rules of Evidence, the State will object in the middle of your closing argument, and I will have to rule on it. Do you understand that?

THE DEFENDANT: Yes, ma'am.

THE COURT: And if they – I can't give you any breaks because you haven't been to law school. Do you understand that? I have to follow the rules.

THE DEFENDANT: Yes, ma'am.

Despite Grinstead's insistence that further discussion with counsel would not be helpful, the court recessed for five minutes to allow the two to speak in private. Following the recess, the trial judge asked counsel whether he believed Grinstead was competent, to which he replied, "Yes." When asked whether Grinstead understood the charges against him, counsel answered, "He does." Grinstead assured the trial court that no one was forcing him to waive counsel, and the trial court made its finding:

Okay. The Court finds that Mr. Grinstead is making a knowing and voluntary exercise of his right to counsel or right to waive his counsel and represent himself. Once we get the written waiver, you will be – I'm going to appoint Mr. Shepherd as your standby counsel in case you have any legal questions, okay, but we are going to go right into closing arguments as planned.

Grinstead signed a handwritten Waiver of Right to Counsel, providing in relevant part: "after having been informed of his constitutional and statutory right to counsel in the trial of this cause, [Defendant] hereby waives his right to counsel."

From this record, we conclude that the trial court sufficiently apprised Grinstead of the risks, dangers, and disadvantages of self-representation, including that he would not be granted special consideration with respect to the rules of evidence and procedure, and ensured that he understood the nature of the charges against him. There is no evidence in the record to

suggest that Grinstead was coerced into making his waiver. The waiver was therefore made knowingly, intelligently, and voluntarily.

**Competent**

We have previously held that the test for competence to proceed pro se "is whether a defendant has the ability to present his own defense without the assistance of counsel."[3] *Chadwick v. State*, 277 S.W.3d 99, 104 (Tex. App.—Austin 2009) (citing *Indiana v. Edwards*, 554 U.S. 164, 183 (2008)), *aff'd*, 309 S.W.3d 558 (Tex. Crim. App. 2010).

Grinstead contends that his behavior before and during trial raised "red flags" and "suggested possible mental health issues that should have been explored before accepting his waiver of the right to counsel." Mental illness is not a "unitary concept" and can vary in degree and over time. *Edwards*, 554 U.S. at 175. As the Supreme Court explained:

> It interferes with an individual's functioning at different times in different ways
> . . . . In certain instances an individual may well be able to satisfy [the] *Dusky*[ *v. United States*, 362 U.S. 402, 402 (1960),] mental competence standard [to stand

---

[3] There is no agreement among Texas courts as to the proper standard for determining competence to exercise the right to self-representation. *See Davis v. State*, 484 S.W.3d 579, 585 (Tex. App.—Fort Worth 2016, no pet.) (defendant must be "competent to conduct her own defense without assistance of counsel"); *Fletcher v. State*, 474 S.W.3d 389, 401 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd) (holding that there is no constitutional requirement to conduct inquiry regarding appellant's competence to conduct his own defense once he has been found competent to stand trial); *Cudjo v. State*, 345 S.W.3d 177, 185–86 (Tex. App.—Houston [14 Dist.] 2011, pet. ref'd) ("The standard for waiving the right to counsel, generally, is no higher than that for competency to stand trial."). While neither the United States Supreme Court nor the Texas Court of Criminal Appeals ("CCA") have endorsed a specific standard, the Supreme Court has explained that, in its view, "an instance in which a defendant . . . would choose to forgo counsel at trial . . . calls for a different standard" than that for competency to stand trial because the latter "assume[s] representation by counsel." *Indiana v. Edwards*, 554 U.S. 164, 174–75 (2008); *cf. United States v. Fields*, 761 F.3d 443, 469 (5th Cir. 2014), *as revised* (Sept. 2, 2014) (holding reasonable jurists would not disagree with district court's conclusion that *Edwards* "provides the trial court with 'discretionary authority' to consider competency under a higher standard, but does not so require").

trial], for he will be able to work with counsel at trial, yet at the same time he may be unable to carry out the basic tasks needed to present his own defense without the help of counsel.

*Id*. at 175–76.

Considering the fluid nature of competency, the Court has held that "the Constitution permits judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so." *Id*. at 178. As the Court acknowledges, "the trial judge . . . will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant." *Id*. at 177. The Texas Court of Criminal Appeals has agreed, stating that "the trial judge is in the best position to make the decision of whether a mentally ill defendant is competent to proceed *pro se*." *Chadwick*, 309 S.W.3d at 561.

Therefore, since competency is a mixed question of law and fact that turns on an evaluation of credibility and demeanor, we review the trial court's ruling for an abuse of discretion. *Id*. A trial court abuses its discretion when its ruling is arbitrary, unreasonable, or without reference to any guiding rules or principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990). We afford "almost total deference" to the court's ruling and "view the evidence in the light most favorable to the . . . ruling." *Chadwick*, 309 S.W.3d at 561. We will imply any findings of fact supported by the evidence necessary to support the ruling when the judge failed to make explicit findings. *Id*.

An invalid waiver of the right to counsel "waives nothing," and the right to trial counsel "remain[s] intact." *Williams*, 252 S.W.3d at 358. As a result, when a trial court permits a defendant to represent herself without a valid waiver, the court denies the defendant the right to

15

trial counsel. *Id*. at 358–59. "A complete denial of the constitutional right to counsel at trial is a structural defect that affects the framework of the trial." *Id*. at 357. When the right is violated, prejudice is presumed because the trial has been rendered "inherently unfair and unreliable." *Id*. The violation is consequently reversible error not subject to a harm analysis. *Id*.

We conclude from the record that the trial court did not abuse its discretion in finding that Grinstead's waiver of his right to counsel and exercise of his right to self-representation were made competently. Prior to trial, Grinstead had expressed misgivings about the representation he was receiving. His motion to dismiss counsel emphasized his strained relationship with his attorney and the breakdown in trust and effective communication between them. While Grinstead's subsequent letter to the court and statements during recess at trial contain serious and troubling allegations concerning the words and actions of counsel, the truth of those allegations is—for purposes of the present inquiry—less important than their having been made. The allegations reveal a defendant fundamentally antagonistic toward, and in disagreement with, his appointed counsel. In light of the erosion of trust between Grinstead and his attorney, the trial court could have reasonably determined that Grinstead's decision to proceed pro se was rational and considered. Moreover, we are unwilling, on the record before us[4], to conclude that they reflect mental illness so severe that it would prevent Grinstead from being able to represent himself.

Grinstead emphasized during closing that his purpose in requesting to represent himself was in part to provide his account of events:

---

[4] The record as it pertains to the relationship between Grinstead and counsel is quite sparse. Both sides, in a desire to protect privileged communications, demurred when asked by the trial court to explain certain points of conflict. Indeed, Grinstead's preoccupation with not waiving attorney-client privilege is one factor supporting a finding of competency.

16

Now, been here a year and seven days waiting for yesterday in here. Everything – the phone conversations, all this BSing, I decide – we're stuck with what these lawyers do or the jailhouse snitches or the threats, put it all over here in my left hand, and I kept it there, and only thing I had my right hand over here was the truth. I testified yesterday and what I'm here to do, this was always the plan. The whole time this was all I had going for me . . . . And this moment is what I've been waiting for a year and seven days. I was going to let them play out everything they had. And I'm just going to sit there to let all the lawyers do all that work and I was going to hold on to this until I got my shot. Or tell people – 13 people that don't know me, don't know her, don't assume too much just because I'm down.

Prior to the trial court's ruling, Grinstead had demonstrated the ability to communicate effectively, make reasoned arguments from the evidence, conduct himself with appropriate decorum and politeness in court, and understand the nature of his defense and the charges against him. When discussing his problematic relationship with counsel, Grinstead expressed a solicitous concern for attorney-client privilege and informed the trial court that he had considered reporting counsel's behavior to the State Bar. During plea negotiations, in response to the State's assertion that it was basing its offer of forty-five years on his criminal history, Grinstead noted that he did not have a violent history. When the State explained that Grinstead had a felony conviction, he clarified that it was for a state jail felony. At his final arraignment, Grinstead asked the trial judge to explain how sentencing works in a jury trial.

Grinstead's dispute with counsel stemmed in part from a disagreement over legal strategy and the questions to be asked on cross-examination. Grinstead made a list of questions that he wanted counsel to ask, including whether the surveillance video from the salon still existed, why portions of it were not being introduced at trial, and why his interaction with Stone

17

on the video was not being shown to the jury.[5]  While Grinstead testified during the defense's case-in-chief against the advice of counsel, his testimony and consent defense were coherent and rational.  He had explanations for why Stone would have called 911, why he had placed his knife on the shelf during the encounter, and why he had given a different factual account to his brother in a jail call.

During the *Faretta* hearing, Grinstead explained that he was requesting to make his own closing argument, the purpose of which he described as "[t]o inform the jury of the evidence presented and let them know your thoughts."  He insisted that he had paid attention to the jury charge and knew both the number of counts he was charged with as well as the punishment range for the offense.

Grinstead also emphasizes his economic situation and educational background in arguing that he was incompetent to represent himself.  While we consider the totality of the circumstances, we do not conclude that Grinstead's homelessness, lack of stable employment, or 10th grade education are significant or persuasive factors in themselves in making a competency determination.  Insomuch as such considerations are relevant to the knowingness or intelligence of his waiver, the issue has been discussed above.  Moreover, Grinstead testified that he had jobs "on and off" and, though he had experienced homelessness before, had only been living "in the streets" for three or four days at the time of the offense.  Prior to that, he had been staying with family in Bastrop upon his release from jail.[6]

---

[5]  Grinstead's attorney explained that the original video no longer existed and that no such interaction was visible on the body camera recording admitted at trial.

[6]  To the extent that Grinstead suggests that the circumstances surrounding his arrest demonstrate his incompetency to engage in self-representation, there is no evidence that a mental illness, if present, "interfered with his functioning *when trial commenced*."  *See Cudjo*, 345 S.W.3d

18

Cases from this Court and our sister courts help to place Grinstead's case in context. In *Chadwick v. State*, we held that the trial court did not err in denying appellant's motion to proceed pro se on the basis of competence where appellant interrupted his counsel during trial to personally argue motions that his attorney had not adopted. 277 S.W.3d at 104. We noted that appellant "jumped from one topic to another" and spent most of his time on "ad hominem attacks" on the prosecutor, judge, bailiffs, judges from prior cases, and other county and state officials. *Id*. Some of appellant's arguments were "incoherent," and he had filed several incoherent written motions with the trial court pro se. *Id*. In *Cudjo v. State*, the Fourteenth Court of Appeals held that the trial court did not abuse its discretion in permitting the defendant to represent himself despite evidence that he suffered from bipolar disorder and was housed in a prison mental health unit. 345 S.W.3d 177, 186 (Tex. App.—Houston [14 Dist.] 2011, pet. ref'd). The court instead emphasized that the defendant:

> was respectful to the trial court, the prosecutors, the witnesses, for the most part, and the jury; he proceeded in an orderly fashion as guided by the trial court; he asked coherent questions, for the most part, when he cross examined the State's witnesses and presented himself as a witness; he objected to several questions and comments by the prosecutors; and he clearly presented and articulated defenses of self defense and lack of motive.

*Id*. at 184. Finally, in *McCoin v. State*, the Sixth Court of Appeals, emphasizing the trial judge's ability to observe the proceedings, held that the defendant in a capital murder case was competent to waive counsel despite evidence that he "filed numerous rambling pro se

at 187 (emphasis added). Moreover, at trial Grinstead provided an explanation for his outburst in the parking lot during the arrest, asserting that he was trying to draw the attention of bystanders to safeguard against potential police misconduct. We are also inclined to view Grinstead's reluctance to provide officers with his last name or date of birth as uncooperativeness and not a failure of memory. Lastly, Grinstead admitted at a pretrial hearing that he had been under the influence of narcotics on the day of the arrest, possibly explaining any aberrant behavior.

19

motions"; "was removed from the courtroom for becoming belligerent and argumentative with the trial judge" in a pretrial hearing; and "rushed toward the bench holding an object, perhaps a pen, in a threatening manner." 56 S.W.3d 609, 613 (Tex. App.—Texarkana 2001, no pet.). The circumstances of Grinstead's case are far less severe than those of *Chadwick* and *McCoin* and more akin to those of *Cudjo*.

Ultimately, given the record before us, we find that the trial court did not abuse its discretion in finding that Grinstead had the ability to present his defense without the assistance of counsel. *See Chadwick*, 277 S.W.3d at 104. Contrary to Grinstead's argument on appeal, we do not believe that the trial court's inquiry into his background was "perfunctory." And while the court did not specifically inquire into Grinstead's mental health history, it was not required to do so, as the record was otherwise sufficient for the court to assess his competence to make a "knowing exercise of the right to defend himself." *See Blankenship*, 673 S.W.2d at 583; *see also Martin*, 630 S.W.2d at 954. The trial judge was in the best position make a "fine-tuned" determination of Grinstead's competence, and we afford her decision almost total deference. *See Chadwick*, 309 S.W.3d at 561; *Edwards*, 554 U.S. at 177.

Grinstead's arguments concerning the content of his closing argument, made after the trial court's ruling, are not relevant to our review of whether the ruling was an abuse of discretion. Likewise, any harm caused by his self-representation is beyond the scope of our consideration. As Grinstead himself noted when pressed by the trial court on the risks of representing himself, the decision was his. While a decision to proceed pro se "must be knowingly and intelligently made, it need not be wise." *Scarbrough v. State*, 777 S.W.2d 83, 92 (Tex. Crim. App. 1989). The right is "personal," and the defendant must "bear the personal consequences of a conviction." *Faretta*, 422 U.S. at 834. "[A]lthough he may conduct his own

20

defense ultimately to his own detriment, his choice must be honored out of that respect for the individual which is the lifeblood of the law." *Id.* (internal quotation marks omitted). In the end, "a defendant must be allowed to represent himself 'if he truly wants to do so.'" *Blankenship*, 673 S.W.2d at 584 (quoting *Faretta*, 422 U.S. at 817).

For the foregoing reasons, we conclude that the trial court did not abuse its discretion in finding Grinstead competent to waive his right to counsel and proceed pro se during closing argument and the punishment phase of trial. We therefore overrule his sole issue.

### Modification of Judgment

While reviewing the record, we found two typographical errors in the judgment against Grinstead. We have the authority to modify a trial court's judgments and affirm them as modified. *See* Tex. R. App. P. 43.2(b); *Bray v. State*, 179 S.W.3d 725, 727 (Tex. App.—Fort Worth 2005, no pet.). First, the judgment incorrectly states that Grinstead pleaded guilty. Second, while the field for indicating a finding of a deadly weapon is marked "N/A," the jury found that Grinstead used or exhibited a deadly weapon in the commission of each count. Accordingly, we modify the judgment to reflect that Grinstead pleaded "not guilty" and that the "findings on deadly weapon" is "yes." *See Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993) (courts of appeals have authority to modify judgment).

### CONCLUSION

Having overruled Grinstead's single issue, we affirm the trial court's judgment of conviction as modified.

_____

Edward Smith, Justice

Before Justices Goodwin, Triana, and Smith

Modified and, as Modified, Affirmed

Filed:   November 19, 2021

Do Not Publish